INCOME CAPITALIZATION APPROACH (continued)

cash flow to the equity investor for the first year of the projected period divided by the initial equity investment.

The overall capitalization rate must satisfy both the mortgage capitalization rate requirement of the lender and the equity dividend requirement of the equity investor. Mortgage-equity analysis can be considered as a composite rate, weighted in proportion to the total property investment represented by debt and equity. The overall capitalization rate is a weighted average of the mortgage capitalization rate ($R_M$) and equity capitalization rate ($R_E$). The loan-to-value ratio (M) represents the loan or debt portion of the property and the equity ratio (E) represents the equity portion of the property. The sum of M and E is 100% or 1.00.

Typical mortgage terms and conditions may be obtained by surveying lenders active in the market area. Equity capitalization rates are derived from comparable sales by dividing the annual equity dividend of each sale by the equity investment. The equity capitalization rate used to capitalize the subject property's equity dividend ultimately depends on the appraiser's judgment. The appraiser surmises how the investors perceive the relationship between market value and investment value. This is preferably by interviewers with local investors and developers.

When the mortgage and equity capitalization rates and ratios are known, an overall capitalization rate may be derived with the band-of-investment, or weighed-average techniques using the following formulas:

- Mortgage Component = Mortgage Ratio (M) X Mortgage Rate ($R_M$)
- Equity Component = Equity Ratio (E) X Equity Capitalization Rate ($R_E$)
- Overall Ratio ($R_O$) = Mortgage Component + Equity Component or $R_O = (M \times R_M) + (E \times R_E)$

    (*The Appraisal of Real Estate*; Thirteenth Edition; Appraisal Institute; pages 505-507.)

In the case of the subject property, the overall capitalization rate is calculated applying the band-of-investment technique using characteristics derived interviews with local developers and investors, from comparable sales, from Korpacz Real Estate Investor Survey, or from RealtyRates.com. Current indications are presented as follows:

INCOME CAPITALIZATION APPROACH (continued)

| Item | Input | | | | | OAR |
|---|---|---|---|---|---|---|
| **Minimum** | | | | | | |
| Spread Over 10-Year Treasury | 0.94% | DCR Technique | | 1.15 | 0.047573 | 0.90 | 4.92 |
| Debt Coverage Ratio | 1.15 | **Band of Investment Technique** | | | | |
| Interest Rate | 3.66% | Mortgage | | 90% | 0.047573 | 0.042815 | |
| Amortization | 40 | Equity | | 10% | 0.074456 | 0.007446 | |
| Mortgage Constant | 0.047573 | OAR | | | | | 5.03 |
| Loan-to-Value Ratio | 90% | **Surveyed Rates** | | | | | 4.77 |
| Equity Dividend Rate | 7.45% | | | | | |
| **Maximum** | | | | | | |
| Spread Over 10-Year Treasury | 3.35% | DCR Technique | | 1.90 | 0.101652 | 0.60 | 11.59 |
| Debt Coverage Ratio | 1.90 | **Band of Investment Technique** | | | | |
| Interest Rate | 6.06% | Mortgage | | 60% | 0.101652 | 0.060991 | |
| Amortization | 15 | Equity | | 40% | 0.153837 | 0.061535 | |
| Mortgage Constant | 0.101652 | OAR | | | | | 12.25 |
| Loan-to-Value Ratio | 60% | **Surveyed Rates** | | | | | 11.64 |
| Equity Dividend Rate | 15.38% | | | | | |
| **Average** | | | | | | |
| Spread Over 10-Year Treasury | 2.16% | DCR Technique | | 1.39 | 0.065950 | 0.75 | 6.85 |
| Debt Coverage Ratio | 1.39 | **Band of Investment Technique** | | | | |
| Interest Rate | 4.96% | Mortgage | | 75% | 0.065950 | 0.049462 | |
| Amortization | 28 | Equity | | 25% | 0.110177 | 0.027544 | |
| Mortgage Constant | 0.065950 | OAR | | | | | 7.70 |
| Loan-to-Value Ratio | 75% | **Surveyed Rates** | | | | | 8.46 |
| Equity Dividend Rate | 11.02% | | | | | |

RealtyRates.com INVESTOR SURVEY - 2nd Quarter 2014*
INDUSTRIAL - WAREHOUSES & DISTRIBUTION CENTERS

*1st Quarter 2014 Data

Copyright 2014 RealtyRates.com ™

The following data is utilized to develop the capitalization rate using the band of investment technique.

- Mortgage ratio: 70%

- Interest rate: 6%

- Term:  20 year amortization, paid monthly

- Mortgage Rate or Mortgage Constant: 0.085972

- Equity Capitalization Rate: 12%

INCOME CAPITALIZATION APPROACH (continued)

The capitalization rate is calculated as follows:

| Mortgage Ratio | | Mortgage Rate | | |
|---|---|---|---|---|
| 0.70 | x | 0.085972 | | 0.06018 |
| Equity Ratio | | Equity Capitalization Rate | | |
| 0.30 | x | 0.120 | + | 0.03600 |
| Indicated Capitalization Rate | | | | 0.09618 |
| | | | ROUNDED TO | 9.6% |

Estimated Land Component

The comparable rents all include land as a component of the rent. As such, the estimated market rent also includes land contribution. In order to estimate the value of the subject building only, the land component must be projected and the value of the same subtracted to arrive at building-only.

The amount of land necessary to service the subject improvements is based on land to building ratios that are typical of the market. The comparable data presented indicate the following land to building ratios:

| | | |
|---|---|---|
| Rent #1 | 3.7 | : 1 |
| Rent #2 | 2.8 | : 1 |
| Rent #3 | 6.4 | : 1 |
| Sale #1 | 6.8 | : 1 |
| Sale #2 | 3.4 | : 1 |
| Sale #3 | 3.7 | : 1 |

Greatest weight is accorded the median of the data set, with a land to building ratio of 3.7 deemed reasonable. Utilizing this ratio the estimated land required to service the subject building is calculated as follows:

$$13,770 \text{ sq. ft.} \quad x \quad 3.7 \quad = \quad 50,949 \text{ sq. ft}$$

The appraisers conducted a market search for comparable industrial lot sales of between 30,000 square feet and 70,000 square feet within the PSJA area. The following three sales were discovered to have occurred in the two years prior to the effective date of this appraisal:

| Address | Sale Date | Use | SP | Size | Price/SF |
|---|---|---|---|---|---|
| 4901 Fir, Pharr, TX | 3/16/2010 | Industrial | 75,000 | 40,102 | $ 1.87 |
| 5804 N. Gumwood, Pharr TX | 4/19/2010 | Industrial | 83,000 | 40,040 | $ 2.07 |
| 10004 BR Becker Ln, Pharr, TX | 8/16/2011 | Industrial | 80,000 | 33,970 | $ 2.36 |

INCOME CAPITALIZATION APPROACH (continued)

The land sale data indicates a range from $1.87 to $2.36 per square foot for industrial lots. With greatest weight accorded the mean of the range, the estimated land component value is calculated as follows:

| Land Required to Service Subject Bldg | | Est. Price / sq. ft. | |
|---|---|---|---|
| 50,949 | sq. ft. x | $2.11 / sq. ft. = | $107,502.39 |

Estimated Market Value By Income Capitalization Approach

The subject's estimated market value by the Income Capitalization Approach is calculated as follows and abstracts the estimated land component to arrive at the estimated value for the building only:

| Net Operating Income | $ | 50,733.29 |
|---|---|---|
| Divided by Cap. Rate | / | 9.6% |
| Subtotal | $ | 528,471.75 |
| Less Est. Land Necessary to Service Subject Building | - | 107,502.39 |
| Est. Retrospective Market Value by Income Cap. Approach | $ | 420,969.36 |
| ROUNDED TO | $ | 421,000.00 |

## SALES COMPARISON APPROACH

Definition and Scope

"In the sales comparison approach, the appraiser develops an "In the sales comparison approach, the appraiser develops an opinion of value by analyzing closed sales, listings, or pending sales of properties that are similar to the subject property.  The comparative techniques of analysis applied in the sales comparison approach are fundamental to the valuation process. Estates of market rent, expenses, land value, cost, depreciation, or other value parameters may be derived in the other approaches to value using comparative techniques.   Similarly, conclusions derived in the other approaches are often analyzed in the sales comparison approach to estimate the adjustments to be made to the sale prices of comparable properties.

"In the sales comparison approach, an opinion of market value is developed by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract (i.e., for which purchase offers and a deposit have been recently submitted).   A major premise of the sales comparison approach is that an opinion of market value of a property can be supported by studying the market's reaction to comparable and competitive properties."[5]

Steps in Applying the Sales Comparison Approach

In order to establish an indication of market value for the subject property, an orderly process takes place allowing the appraiser to carefully analyze the data gathered and form this data into an indication of market value for the property being appraised.  This analysis follows a logical sequence whereby:

1.   The appraiser finds properties similar to the subject for which sales, listings, contracts are available.

2.   Comparables are qualified by the appraiser when he confirms the price, terms, motivation, or authenticity of each comparable.

3.   Each comparable is then compared to the subject property giving consideration to the time of sale, location influences, and physical characteristics.

4.   Each comparable is then evaluated and adjusted as being more, less, or equal in value to the subject property, based on each of the three broad classifications mentioned in Paragraph #3.

---

[5] Appraisal Institute, *The Appraisal of Real Estate*, Thirteenth Edition, 2008, Pg. 297.

SALES COMPARISON APPROACH (continued)

5.      After comparing the comparables to the subject property and making adjustments for any major dissimilarities, each comparable will then indicate a probable selling price.  From these indicated values a final value estimate will be correlated.

Comparable Sales

The appraisers completed a thorough market search for recent sales; however, very few recent sales are available.  The three best available and most similar comparable sales are presented with analysis to follow.

SALES COMPARISON APPROACH (continued)



COMPARABLE SALE #1

Type of Property:  Office/Warehouse
Location:  906 Owassa Road, Pharr, Texas
Date of Sale:  April 14, 2011
Consideration:  $360,000.00
Improvements:   An approximate 6,000 square foot single-story pre-engineered metal panel
     office/warehouse office; 1,200 square feet of office (20%) and 4,800 square feet of
     warehouse; completed in 2007. Condition and construction are considered average. Grade
     level. Lot size 40,560 square feet. Land to building ratio = 6.8:1
Legal Description:  Lot 15, Steel Horse Industrial Park Subdivision, City of Pharr, Hidalgo County,
     Texas
Grantor:  El Norte Holdings
Grantee:  Midwest Inspection Services
Confirmation:  Agent/MLS#140400; HCDR Doc. No. 2198043
Units of Comparison:
     Price/SF:  $56.40

SALES COMPARISON APPROACH (continued)



COMPARABLE SALE #2

Type of Property:  Office/Warehouse
Location:  400 E. Pecan Boulevard, McAllen, Texas
Date of Sale:  November 22, 2010
Consideration:  $470,000.00
Terms:  Cash to Seller
Improvements:   An approximate 10,500 square foot single-story, grade-level, pre-engineered
        metal panel office/warehouse office; 1,830 square feet of office (21%) and 8,670 square
        feet of warehouse; completed in 2003.  Condition and construction are considered average.
        Lot size is 35,860 square feet.
Legal Description: Lot B, Eagle Place Subdivision, City of McAllen, Hidalgo County, Texas
Grantor:  SANB
Grantee:  Box Family LP, Ltd.
Recording:  Document #2156731, HCDR
Verification:  Agent/Deed
Unit of Comparison:
        Price Per Square Foot:  $44.76

SALES COMPARISON APPROACH (continued)



COMPARABLE SALE #3

Type of Property:  Office/Warehouse
Location:  3102 Hibiscus, Pharr, Texas
Date of Sale:  March 15, 2012
Consideration:  $215,000.00
Terms:  Cash to Seller
Improvements:  An approximate 5,000 square foot single-story, grade-level, pre-engineered metal
              panel office/warehouse office; 800 square feet of office (16%) and 4,200 square feet of
              warehouse; completed in 2005.  Condition and construction are considered average.  Lot
              size is 18,482 square feet.
Legal Description: Lot 14, 3100 Sugar Subdivision, City of Pharr, Hidalgo County, Texas
Grantor:  Vantage Bank Texas
Grantee:  Jan R. Koepke
Recording:  Document #2290227, HCDR
Verification:  Agent MLS#153612/Deed
Unit of Comparison:
        Price Per Square Foot:  $43.00

SALES COMPARISON APPROACH (continued)

Comparable Adjustment Grid

| Adjustment | Subject | Sale 1 | Sale 2 | Sale 3 |
|---|---|---|---|---|
| Total Sales Price | | $360,000 | $470,000 | $215,000 |
| Less Est. Land Value | | $80,000 | $107,000 | $40,000 |
| Sales Price Building Only | | $280,000 | $363,000 | $175,000 |
| | | | | |
| Price/SF (land abstracted) | | $46.67 | $34.57 | $35.00 |
| | | | | |
| Financing Terms | | Cash | Cash | Cash |
| | | 0 | 0 | 0 |
| | | | | |
| Conditions of Sale | | Arms | Arms | Arms |
| | | Length | Length | Length |
| | | 0 | 0 | 0 |
| | | | | |
| Market Conditions | | Apr-11 | Nov-10 | Mar-12 |
| | | 0 | 0 | 0 |
| **Adjusted Price/Sq Ft Building Only** | | **$46.67** | **$34.57** | **$35.00** |
| ] | | | | |
| Location | | Owassa | Pecan | Hibiscus |
| | | N/A | N/A | N/A |
| | | | | |
| Size | 13,770 | 6,000 | 10,500 | 5,000 |
| | | -5% | 0% | -5% |
| | | | | |
| Age | 20 Eff. | 4 Eff. | 7 Eff. | 7 Eff. |
| | | -16% | -13% | -13% |
| | | | | |
| Quality | 67% CC | 20% CC | 21% CC | 16% CC |
| | | 7% | 7% | 7% |
| | | | | |
| Net Adjustments | | -14% | -6% | -11% |
| **Adj. Value/Sq Ft Building Only** | | **$40.13** | **$32.50** | **$31.15** |

SALES COMPARISON APPROACH (continued)

Comparable Sales Analysis

The comparables presented represent the best available data and are considered to provide a reliable indication of value. Adjustments are based not only on matched paired analysis but on the appraisers' knowledge and experience. Abstracting the land component eliminates the need for location adjustments. Size adjustment recognizes the market phenomenon that smaller buildings command a higher price per square foot. Age is adjusted at 1% per year in effective age difference. Quality adjustment recognizes overall construction quality and additional climate control area.

The comparable sales presented produce the following adjusted values for the subject for building area only:

Comparable #1 ------------- $ 40.13 per square foot

Comparable #2 ------------- $ 32.50 per square foot

Comparable #3 ------------- $ 31.15 per square foot

Greatest weight of consideration is given the lower end of the range due to effective age, with $31.15 per square foot deemed reasonable.

Estimated As Is Value By Sales Comparison Approach

The subject's estimated as is market value by the Sales Comparison Approach is calculated as follows:

Subject:

| | | | | | | |
|---|---|---|---|---|---|---|
| 13,770 | Sq Ft @ | $31.15 | /sf = | $ | 428,935.50 |
| | | | ROUNDED TO | $ | 430,000.00 |

## CORRELATION

The approaches to value have been considered and the estimated "as is" market value indications, excluding FF&E, is as follows:

| | |
|---|---|
| Cost Approach | Not Applicable |
| Income Capitalization Approach | $ 421,000.00 |
| Sales Comparison Approach | $ 430,000.00 |

The Cost Approach is that approach in appraisal analysis, which is based on the proposition that the informed purchaser would pay no more than the cost of producing a substitute property with the same   utility as the subject property.  The Cost Approach, in effect, will tend to set the price which specific users would pay for its' specific purposes, reflecting the extent to which the property contributes to the utility or profitability of that particular enterprise.  Due in large part to the subject age and depreciation, the cost approach is not considered applicable as it would not provide a reliable indication of market value.

The Income Capitalization Approach estimates gross income and expenses based on actual projection data, which is abstracted from the market.  The net profit is then capitalized into value by use of an overall rate, which is also abstracted from the market.  This approach, in effect, indicates what funds a typically informed investor would commit for the right to receive the benefits provided by the subject under the present market conditions.  This approach indicates a market value of approximately $421,000.00 for the subject property.

Greatest weight is accorded the Sales Comparison Approach which allows the appraisers a more precise method of abstracting the land value from each comparable sales price rather than subtracting the subject's hypothetical land contribution.  is a process of analyzing sales of similar recently sold properties in order to devise an indication of the most probable sales price of the property being appraised.  The reliability of this technique is highly dependent upon the degree of comparability.  The comparable sales utilized are considered to have reasonable comparability.  Nevertheless, there is a lack of more recent sales that are similar in size, quality and location; therefore, the Comparable Sales Approach is presented to lend support to the final value estimate.

## CERTIFICATE OF VALUE

It is the appraisers' opinion that the retrospective market value estimate, as of February 1, 2012, excluding FF&E, was as follows:

FOUR HUNDRED AND THIRTY THOUSAND DOLLARS

($430,000.00)

Based upon the appraisers' analysis of past events assuming a competitive and open market, the appraisers estimate a reasonable marketing period for this type of property at the market value estimated in this report to not exceed twenty-four months.

Based upon the appraisers' analysis of past events assuming a competitive and open market, the appraisers estimate a reasonable exposure period for this type of property at the market value estimated in this report would not have exceeded twenty-four months.


Joe Patterson, MAI, SRA
President, TX-1321595-G

Irene B. Thompson
Associate, TX-1336175-G

ADDENDUM

## Texas Appraiser Licensing and Certification Board
P.O. Box 12188 Austin, Texas 78711-2188
### Certified General Real Estate Appraiser

Number: **TX 1321595 G**

Issued: **10/25/2013**          Expires:     **12/31/2015**

Appraiser: **JOSEPH WILLIAM PATTERSON III**

Having provided satisfactory evidence of the qualifications required by the
Texas Appraiser Licensing and Certification Act, Texas Occupations Code,
Chapter 1103, is authorized to use this title, Certified General Real Estate
Appraiser.

Douglas E. Oldmixon
Commissioner

QUALIFICATIONS OF THE APPRAISER
JOSEPH W. PATTERSON, III

State Licensing and Certification
Licensed and certified by the State of Texas as a General Real Estate Appraiser:  License Number
TX-1321595-G (Date of Issue: October 25, 2013and Date of Expiration: December 31, 2015)

Professional Designations
Member of Appraisal Institute with MAI and SRA Designations

Education
Bachelor of Business Administration from Baylor University, Waco, Texas

Graduate Study at Baylor University Law School, Waco, Texas

Continuing Education in Real Estate and Appraising at University of Houston, University of North
Carolina, San Diego University, University of Colorado, University of Illinois, Mills College (Oakland),
and University of Texas Pan American

Professional Affiliations
Member of the McAllen Board of Realtors

Member of the Texas Association of Realtors

Member of the National Association of Realtors

Professional Offices Held
President of Rotary Club of McAllen, Texas, Chapter #2076, 1996-1997

President of the Society of Real Estate Appraiser, Rio Grande Valley, Chapter #144 – 1983-1984

Board of Directors of the Society of Real Estate Appraiser, Waco, Texas, Chapter #145 – 1975-
1977

Board of Directors of the Society of Real Estate Appraiser, Rio Grande Valley, Chapter #144 –
1976-1991

Board of Directors of the American Institute of Real Estate Appraisers, South Texas Chapter #29 –
1986-1991

Teaching Experience
Instructor for Real Estate Appraising and Real Estate Law at Hill Junior College, Hillsboro, Texas

Substitute Instructor for Real Estate Principle, Real Estate Law, Real Estate Finance, Real Estate
Appraising and Business

QUALIFICATIONS OF THE APPRAISER (continued)
JOSEPH W. PATTERSON III

Professional Experience

Joe Patterson began his appraisal experience in 1971 as an independent appraiser with Smith Real Estate Association in Waco, Texas for five years. He was also a staff appraiser for First Federal Savings and Loan Association in Waco, Texas for one year. He then associated himself with D.U. Buckner, a local MAI, for seven years as an independent fee appraiser. In 1986 he opened his own office, J.W. Patterson and Associates, and currently covers the Rio Grande Valley area from his McAllen office.

As an appraiser for the past 43 years, he has worked on the following types of properties: single family residences, duplexes, apartments, manufacturing properties, shopping centers, discount houses and supermarkets, hospitals, hotels and motels, funeral homes, restaurants, developments, churches, schools, medical clinics, warehouses, banks, farms, ranches, bowling alleys, convention centers, grain elevators, gins, condominium projects, food processing plants, civilian airport facilities, and "FIRREA" affordable housing program. Other assignments include partial taking, eminent domain, easements, and partial interests.

Joe has also served as the guest speaker and lecturer for numerous local service clubs, professional organizations and schools, including University of Texas Pan American.

Recently Completed Course Studies

USPAP Update 2012/2013, No. 101, offered by the Columbia Institute, Austin, Texas, January 18, 2013

Appraising in a Depressed Market, No. 125, offered by the Columbia Institute, Austin, Texas, January 16, 2013

Interagency Rules of Banks and Credit Unions, No. 011, offered by the Columbia Institute, Austin, Texas, January 15, 2013

Write It Right, No 148, offered by the Columbia Institute, Austin, Texas, January 17, 2013

Online Appraisal Curriculum Overview — Residential, offered by the Appraisal Institute, January 14, 2013,

Online Business Practices and Ethics, offered by the Appraisal Institute, December 12, 2012

Report Writing-the UAD, No. 120, offered by the Columbia Institute, Harlingen, Texas, August 2, 2011

The Mortgage Loan System, No. 015, offered by the Columbia Institute, Harlingen, Texas, August 1, 2011

Practice of Appraisal Review — FHA Protocol, No. 145, offered by the Columbia Institute, Harlingen, Texas, February 2011

USPAP Update 2010-2011, No. 101, offered by the Columbia Institute, Harlingen, Texas, March 2011

USPAP Update No. 101, September 2009

Identifying Relevant Characteristics Course 019 — The Columbia Institute, Sept. 2009

FHA Today Course 114 — The Columbia Institute, March 2009

Fannie Mae Today Course 116 — The Columbia Institute, March 2009

Basic Appraisal Principles, The Appraisal Institute, North Texas Chapter, May 2007

Scope of Work and Appraiser Due Diligence, No. 36, The Columbia Institute, April 2007

USPAP Update No. 101, The Columbia Institute, April 2007

Fundamental of Appraisal Review No. 105, The Columbia Institute, April 2007

QUALIFICATIONS OF THE APPRAISER (continued)
JOSEPH W. PATTERSON III

FHA, the URAR & the 1025 No. 104, The Columbia Institute, April 2007
Business Practices and Ethics, The Appraisal Institute, February 2007
Uniform Standards of Professional Practice, USPAP Update, The Appraisal Institute, Houston Chapter, September 2005
Litigation Skills for this Appraiser, The Appraisal Institute Houston Chapter, Sept. 2005
Ethics & Special Purpose Properties, The Appraisal Institute, September 2005
Appraising from Blueprints and Specifications, The Appraisal Institute Online Continuing Education Program, Chicago, Illinois, February, 2005
Uniform Standards of Professional Practice, USPAP Update, The Appraisal Institute North Texas Chapter, June 2003
Small Hotel/Motel Valuation, the Appraisal Institute Online Continuing Education Program, Chicago, Illinois, November 2002
Appraisal Procedures, The Appraisal Institute, Daniels College of Business, Denver, Colorado, August, 2002
Techniques of Appraisal Review, The Columbia Institute, Course #108, October 2001
Residential Appraisal Update, The Columbia Institute, course #117, October 2001
Standards of Professional Practice, Part C, The Appraisal Institute, September 2001
GIS and Appraising, The Appraisal Institute, Austin, Texas, August, 1999
FHA Appraisal Rules #119, The Columbia Institute, September 1999
Standards of Professional Practice, Part C, The Appraisal Institute, September 1999
Comprehensive Examination Prep, the Appraisal Institute, February 1998

**Texas Appraiser Licensing and Certification Board**
P.O. Box 12188 Austin, Texas 78711-2188
Certified General Real Estate Appraiser

Number:    TX 1336175 G

Issued:    06/03/2014                Expires:    06/30/2016

Appraiser:    **IRENE BECERRA THOMPSON**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Texas Occupations Code, Chapter 1103, is authorized to use this title, Certified General Real Estate Appraiser.

Douglas E. Oldmixon
Commissioner

QUALIFICATIONS OF THE APPRAISER
IRENE B. THOMPSON

State Licensing and Certification
Licensed and certified by the State of Texas as a General Real Estate Appraiser: License Number
TX-1336175-G (Date of Issue: June 3, 2014; Date of Expiration: June 30, 2016)

Education
Graduate, Weslaco High School, May, 1992

Three years education toward Bachelor of Arts in History and Philosophy, Brown University,
September, 1992 through May, 1995

Continuing Education in Real Estate and Appraising at The Appraisal Institute, Lincoln Graduate
Center, The Columbia Institute, Trinity University, Lon Morris College, and Geo Leonard School of
Real Estate.

Professional Experience
Irene Thompson has been associated with Aguirre & Patterson, Inc. from September, 1998, to the
present. As an independent appraiser, Mrs. Thompson has gained valuable experience appraising
various types of properties throughout the Rio Grande Valley. The following is a list of the types of
properties Mrs. Thompson has appraised: single-family residences, multi-family apartments,
residential condominiums, residential lots, unimproved land tracts, subdivisions, right of ways,
easements, dine-in and fast food restaurants, condominium shell facilities, single-tenant and multi-
tenant retail centers, professional business centers, commercial buildings, convenience stores,
professional offices, medical clinics, assisted living centers, rehabilitation hospitals, banquet halls,
community centers, churches, public schools, charter schools, adult and child day care centers,
office/warehouses, distribution warehouses, manufacturing warehouses, condominium warehouses,
cold storage facilities, cement plants, farms, ranches, motels, hotels, mobile home and RV parks,
unimproved commercial lots, self-service and automatic car washes, government facilities subject to
GSA leases, golf courses, auto service/quick lube auto shops, and leasehold estates.

Recently Completed Course Studies
7-Hour USPAP Update, McKissock, June 2014
Appraisal of Self-Storage Facilities, McKissock, June 2014
Land and Site Valuation, McKissock, May 2014
Environmental Issues for Appraisers, McKissock, May, 2014
Mold, Pollution and The Appraiser, McKissock, May 2014
7-Hour USPAP Update, McKissock, May 2012
Ad Valorem Tax Consultation, McKissock, May 2012
Disclosures & Disclaimers, McKissock, May 2012
How to Analyze and Value Income Properties for Financing, McKissock, May 2012
Private Appraisal Assignments, McKissock, May 2012
Analyzing Operating Expenses, The Appraisal Institute, May 6, 2010
Advanced Internet Search Strategies, The Appraisal Institute, May 5, 2010
Uniform Standards of Professional Appraisal Practice, Update – The Appraisal Institute, February
    22, 2010
FHA Today, No. 114, The Columbia Institute, March 2, 2009
Technology for Today's Appraiser, McKissock, May 30, 2008

QUALIFICATIONS OF THE APPRAISER
IRENE B. THOMPSON (continued)

Survey of the Cost Approach, No. 106, The Columbia Institute, April 8, 2008

FHA, the URAR & the 1025, No. 104, The Columbia Institute, April 7, 2008

Uniform Standards of Professional Appraisal Practice, Update — The Appraisal Institute, May 24, 2007

Uniform Standards of Professional Appraisal Practice (Course USPAP) — Online — Center for Career Education — March 20, 2006

Fundamentals of Real Estate Appraisal — Correspondence — Lon Morris College — February 1, 2006

Appraising Residential Properties — Correspondence - Lon Morris College  - August 18, 2004

Uniform Standards of Professional Appraisal Practice, Update (Course- USPAP 2004) — The Appraisal Institute, February 27, 2004

Industry Update Manufactured Housing — Lincoln Graduate Center, February 24, 2003

New Fannie Mae Appraisal Guide — The Columbia Institute, March 14, 2003

Uniform Standards of Professional Appraisal Practice, Update (Course- USPAP 2002) — The Appraisal Institute, April 27, 2002

Principles and Techniques of Appraisal Review (Course - 108) - The Columbia Institute, June 9, 2001

Farm and Land Appraisal (Course - 637) - National Association of Master Appraisers, Lincoln Graduate Center, April 28, 2001

Income Property Appraisal (Course — 231) — Correspondence — Lon Morris College, February 28, 2000

Uniform Standards of Professional Appraisal Practice (Course — USPAP 99) Correspondence — Trinity University, September 1, 1999

Principles of Real Estate (Course — 111) — Geo Leonard School of Real Estate, August 9, 1998

Real Estate Appraisal (Course — 211) — Geo Leonard School of Real Estate, August 29, 1998

Practice of Real Estate Appraisal (Course — 636) — Lincoln Graduate Center, February 2, 1999

Real Estate Law (Course — 311) — Geo Leonard School of Real Estate, February 20, 1999

## Agustin J Rodriguez

316 W. Nyssa
McAllen, Texas 78501
E-mail: bluesunstudio@yahoo.com

956.451.7272 mobile

**SUMMARY:** Have managed design projects from inception thru construction administration for design offices. Launched, managed, and marketed Rio Grande Valley architecture satellite office for over four years for PGA Architects. Developed a project management handbook, a company website, and an office practice standards manual for PGa corporate office and ROFA Architects. Have extensive knowledge of building codes, governing agency regulations, hospital licensing standard and construction. Skilled at building effective, productive working relationships with clients and staff and have excellent analytical, organizational, and creative skills.

### EDUCTATION:

**The University of Texas at Austin**
Bachelor of Architecture
Honors and Activities:

Dec. 1996

Mebane Scholarship Recipient
Slab Student Publication
Furniture Design Scholarship Award

### EMPLOYMENT:

**PSJA ISD**
Pharr Texas

July 2011- present

District Project manager coordinating design and construction teams. Established building programs, staff coordination requirements, schematic designs, and coordination with design team for implementation. Held pre bid and bid conferences with design and construction team. Establish district building and material standards, created a construction filing systems and generated AIA contracts. Head the contractor and design team ranking committees. Head facility board workshops and made board project update presentations. Work closely with other district teams for in house projects. Assist attorneys with drafting architect, engineer and other design professionals contracts; participate in all phases of procurement of design professional and contractor construction contracts; assist with evaluation of design-phase submittals by architects and engineers; review cost estimates by architects; assist with negotiations of terms construction contracts; change orders, requests for information and coordinate and supervise Owner's construction phase project construction staff; coordinate and document Owner's substantial completion, final completion and post-completion due diligence.

**ROFA, Inc. Architects**
McAllen, Texas

September-2005-July 2011

Head designer for ROFA, Inc. McAllen for over 6 years designing Schools, Commercial, Governmental, and Healthcare Projects. Master Plan, Architecture, Interiors, and building systems. Coordinated staff requirements to establish building programs and coordinated design teams.

**Polkinghorn Group Architects, Inc.**
Austin, Texas

September-1994-September 2005

Junior Partner of PGa-Austin with over 10 years of experience in the architecture field. Participated as Project Manager and design lead on a variety of healthcare, commercial, educational, religious and interior projects.

**Cornerstone Group Architects**
Austin, Texas

May 1994-August 1994

Design lead and drafting support with premiere high end residential design/build firm in Central Texas. Developed presentation, schematics, concept drawings and coordinated construction documentation with consultants while attending undergraduate studies at the University of Texas at Austin.

**Dick Clark Architecture**                                        *March 1994-May 1994*
Austin, Texas

Developed concept and presentation models for an International award winning firm while attending undergraduate studies at the University of Texas at Austin.  Projects include single-family and multifamily residential projects, resorts and custom homes throughout the United States and the Caribbean. The firm is a leader In hospitality design of some of Texas' most successful restaurants and golf course amenities.


## SKILLS AND ACCOMPLISHEMENTS:

Design Projects:
> *Managed, selected, and directed design and consultant teams for numerous large and small design projects around the United States.  Coordinated bid and construction documents from design development to construction administration.*

PSJA ISD       *District Project Manager coordinating Education facilities with design and construction teams.*

> ***Selected Project List:***
> *Audie Murphy Middle School: Gignac Architects*
> *Southwest High School: ROFA Architects*
> *Thomas Jefferson Early College Campus: ERO Architects*
> *Aida Escobar Elementary School: EGV Architects*
> *Ford Elementary School: ROFA Architects*
> *Farias Elementary School: ROFA Architects*
> *Escalante Middle School: Gignac Architects*
> *McKeever Elementary School: ROFA Architects*
> *Arnold Elementary School: Vittetta Architects*
> *PSJA ISD Stadium Renovations: ROFA Architects*
> *Austin Middle School: Gignac Architects*
> *LBJ Middle School: EGV Architects*
> *North High School Renovations: ERO Architects*
> *Alamo Middle School Renovations: Gignac Architects*
> *Sorensen Elementary School: ERO Architects*
> *Marcia Garza Elementary School: ERO Architects*
> *Ramirez Elementary School: Milnet Architects*
> *Longoria Elementary School: Gignac Architects*
> *Science Additions: ERO Architects*
> *Science Additions: ROFA Architects*
> *Farias Elementary School: ROFA Architects*

ROFA, Inc. Architects:
> *Head designer coordinating design teams and projects.  Multi disciplinary function as office coordinator and project manager.*

> ***Selected Project List:***
> *Hidalgo County Offices at the formerly know as the Kmart Building – Edinburg,TX*
> *Market Center Commercial Development – McAllen, Texas*
> *Trevino Shopping Center – Pharr, TX*
> *McAllen War Memorial – McAllen, TX*
> *La Piedad Cemetery Monument – McAllen, TX*
> *Valley View Independent School District – Pharr, Texas*
> *PSJA Independent School District – Pharr, Texas*
> *Falfurrias Medical Plaza – Falfurrias, Texas*

Polkinghorn Group Architects, Inc.:

*Developed Marketing strategy and targeted client base for Polkinghorn Group Architects, Inc. Valley office. Established contracts on several healthcare, religious, and residential projects and developed programming for healthcare campuses.*

**Selected Project List:**
*Physician's Hospital of Mercedes - Mercedes, TX*
*Brownsville Imaging Center - Brownsville, TX*
*St. Peter & St. Paul Episcopal Church Master Plan - Mission, TX*
*National Specialty Hospital of El Paso Addition and Renovation - El Paso, TX*
*Sunset Canyon Veterinary Clinic - Dripping Springs, TX*
*DeTar Hospital Renovation - Victoria, TX*
*Bay Area Surgical Center - Webster, TX*
*National Specialty Hospital of San Antonio - San Antonio, TX*
*Coleman County Medical Center - Coleman, TX*
*Butler County Surgery Center - Hamilton, OH*
*North Central Baptist Surgery Center - San Antonio, TX*
*VA Medical Center - Temple, TX*
*Park Place Surgery Center - Lafayette, LA*
*Surgicare of Lake Charles - Lake Charles, LA*
*Podio Residence - Austin, TX*
*Clark Residence - Dripping Springs, TX*
*Dripping Springs Community Library - Dripping Springs, TX*
*St. Martin de Porres, Dripping Springs, TX*
*Round Rock Surgery Center - Round Rock, TX*
*South Austin Health Clinic Addition & Renovation - Austin, TX*

Community/Association Involvement:

*American Institute of Architects: 1997-present*
*Texas Society of Architects: 1997-present*
*Intern Associate Director 2001-2003*
*LRGV-AIA Design Awards Committee Chair: 2002-present*
*BCC Marketing Committee Secretary/Chair 2003-2004*
*LRGV-AIA Executive Committee Member 2002-2004*
*Proyecto Azteca: Volunteer - 2004*
*FAIA Portfolio Deign: "Tom Ashley, FAIA": 2002*
*AIA-Austin Homes Tour Committee: 1997-2000*

Technical:

*Proficient in Autodesk AutoCAD, Adobe PhotoShop, Microsoft Publisher, Adobe PageMaker, Sketch-up, and Windows based programs and software.*
*Free hand concept drawings, models, and renderings*

**AWARDS AND RECOGNITION:**

Community Outreach Award: *Aids Services of Austin - 1999*
AIA-Austin: *Young Architectural Professional Award Nominee - 1999*
Semi-Annual Pulse Innovative Design Contest: *Honorable Mention – 2000*
Veterinary Economics Hospital: *Design Merit Award - 2002*
LRGV-AIA: *Presidential Award – 2002*

Evaluation of Technology, Science, Education & Math

High School Construction Costs Phase I & Phase II

Date:       August 25, 2015

To:         Dr. Daniel King

From:       Augustin Rodriguez, District Project Manager

Phase I

I have been asked by legal counsel to the school district, Mr. Jesus Ramirez,      to      review
certain change orders associated with construction that the school district was asked to undertake
at the Jefferson TSTEM High School main building after the partial collapse during construction.
Mr. Ramirez requested that I determine the estimated additional cost to the district that may have
resulted from replacement of work in place that was damaged as a result of inadequate design or
construction.

To date, I have reviewed and prepared the following report regarding the damages to the
basement floor which resulted from moisture intrusion after the floor had been completed.

I was employed at the district when the change order was requested for replacement of the
basement floor. I have attached the documentation for the change order under Phase I Change
Order. I determined the estimated cost of the basement floor replacement to the district by
making certain assumptions and calculations.

Basement Floor Calculations

1. According to the Schedule of Value budget, the Rubber Cork Flooring (entire building)
   installation under the Construction Contract was for a total of $194,147.00

   I have confirmed that the Schedule of Values has that number allocated.

2. Square footage of building area to take Rubber Cork Flooring 13,377 sq. ft.

   (from construction documents and room finish schedule)

3. Total Square foot cost of Rubber Cork Flooring: $194,147.00/13,377 sq. ft. = 14.13 sq. ft.

4. Basement square foot of area to take Cork Flooring: 4,316 sq. ft.

5. Based on these calculations, the actual Cost of Cork Flooring only for the damaged basement floor was: 4,316 sq. ft. x 14.13 = $60,985.08.

6. The additional design fee should be added to this amount to determine the full amount of the additional cost to the district resulting from the fix.

I assumed that the basement floor as finally completed and approved by the district would have been similar in cost to what the district would have been required to provide for in the first instance.

Phase II

I have been asked by legal counsel to the school district, Mr. Jesus Ramirez, to undertake a cost comparison (on a square foot basis) of the construction costs experienced by the school district for school projects that (1) involved construction of school buildings that included a focus on high school science classroom, and (2) which were designed and constructed between 2011 to 2012.

The objectives of this analysis were multifold:

(a) to determine the extent to which in designing and building the Phase II improvements to the Jefferson TSTEM High School, the school district would have been better served by designing a new building rather than re-adapting the Stambaugh and Textbook buildings;

(b) if, with the benefit of hindsight, it would have made more economic sense to construct a new building, what was the estimated loss to the district as a result of proceeding with the re-adaptation and re-habilitation of the Stambaugh and Textbook buildings.

In the past year, I had several meetings with Mr. Rene Campos, Asst. Superintendent of Support Services, in order to determine on how to proceed. Later, the district engaged the services of Mr. Brad Russell, AIA, and I consulted with him as well as to method of proceeding with determining or quantifying (to the extent possible) the loss to district, if any, resulting from the district's decision regarding this construction project.

We opted initially to obtain the services of Aguirre & Patterson, Inc., Real Estate Appraiser, to evaluate whether a fair market appraisal of each of the buildings (Stambaugh and Textbook) at the time they were re-adapted and re-habilitated was a reasonable approach. Based on our discussions with Ms. Irene Thompson, an appraiser who has appraised numerous public and private properties in the area and testified in eminent domain proceedings, we concluded that an appraisal would provide a fair and reasonable estimate of the fair market value.

From our discussions with Mr. Brad Russell, we determined that we would identify comparable school construction projects which the district had built in the same general time period in order to have a reasonable comparison of construction costs.

I selected five projects constructed by the school district between 2011 and 2012. I revisited the architectural plans and specifications and relevant documents such as the schedules of values and visited each of the sites (which are currently used by the district). Each of the five projects I compared met the following criteria:

1. the specifications were all typical of the district's past and current construction: single-story, flat-roof, doors, windows and fixtures; similar HVAC and lighting control systems; and

2. Brick veneer; linear design.

Each of the five projects met each of the criteria. The compared project specifications differed only with respect to size. Notable also, was the fact the Textbook and Stambaugh buildings included a better quality of interior finishes. Other than those differences, all ~~six~~ seven buildings were comparable in design, materials and construction.

The chart which I have attached contains the data that I obtained from a review of the five projects and the Stambaugh and Textbook buildings.

These are my opinions, based on the information I have reviewed:

1. Of all the seven projects reviewed, the STEM Phase II Projects (Textbook and Stambaugh) are the most expensive projects (on a square foot basis) which the district has constructed at a cost of $193.35.00 per square foot.

2. The next most expensive projects (on a square foot basis) constructed are the TAPP Center Science Bldg at a cost of $196.19 and the Options School of Choice Science Building Addition at a per square foot cost of $197.82 per square foot. This increase of square foot on these campuses was due to utility infrastructure required to bring onto site as they were not existing as in other campuses.

James Rodriguez, District Project Manager



**Thomas Jefferson Early College High School**
**CONSTRUCTION COST COMPARISON**

| BUILDING | SQUARE FEET | CONTSRUCTION COST | COST PER SQUARE FEET |
|---|---|---|---|
| TSTEM STAMBAUGH (ENGINEERING) BUILDING | 10,876 SQ. FT. | $2,102,874.60 | $193.35/ SQ. FT. |
| TSTEM TEXTBOOK (SCIENCE) BUILDING | 14,637 SQ. FT. | $2,830,084.00 | $193.35/ SQ. FT. |
| PSJA HIGH SCIENCE BUILDING ADDITION | 19,197 SQ. FT. | $2,614,539.00 | $136.20/ SQ. FT. |
| MEMORIAL HIGH SCIENCE BUILDING ADDITION | 16,848 SQ. FT. | $2,554,164.00 | $151.60/ SQ. FT. |
| TAPP CENTER SCIENCE BUILDING ADDITION | 5,861 SQ. FT. | $1,149,856.00 | $196.19/ SQ. FT. |
| OPTIONS SCHOOL OF CHOICE SCIENCE BUILDING ADDITION | 5,861 SQ. FT. | $1,159,441.00 | $197.82/ SQ. FT. |
| NORTH HIGH SCIENCE BUILDING ADDITION | 22,080 SQ. FT. | $3,598,000.00 | $162.95/ SQ. FT. |

### THE J. RAMIREZ LAW FIRM
*Attorneys at Law*

700 Veterans Blvd
San Juan, Texas 78589
Phone: (956) 502-5424
Fax: (956) 502-5007

August 28, 2015

<u>Resume</u>

JESUS RAMIREZ was born Edinburg, Texas, 1951; admitted to Texas bar, 1983; admitted to bars of the U.S. District Courts, Southern and Northern District of Texas, the Fifth Circuit Court of Appeals and U.S. Supreme Court. Preparatory Education, University of Texas School of Law. Honors: Articles Editor, International Law Journal; Director, Legal Research Board; Invited to membership: the Criminal Law Journal; Semi-Finalist, Johnson-Swanson Mock Trial Competition.

As a law student, Mr. Ramirez served as a law clerk to the Administrative Law Judges, Texas Comptroller's office in 1981-1982. In that capacity he assisted the three judges with legal research and assisting with drafts of legal opinions in the sales tax and franchise tax area.

As an article editor at the International Law Journal, Mr. Ramirez was responsible for reviewing and editing all legal articles offered by legal scholars for publication. In that capacity, he published *Simpson-Mazzoli: Altering the Policy of Neglect of Undocumented Immigration from South of the Border*, Vol. 18 No. 2, *Texas International Law Journal* (1983). He has also written on local government affairs: *Recent Developments in Public Finance* and *Proposed Amendment to Texas Civil Practice & Remedies Code Should Reduce Nuisance Lawsuits Against Governmental Units.* These were presented to the Texas Municipal League Region 12 Membership Meeting South Padre Island, May 27, 1994; *Is there a Border Along the Rio Grande? Student Admissions: Toward A New Policy* was delivered to the Texas Association of School Boards, October 2, 1994, Dallas, Texas.

Mr. Ramirez is a member of the National Association of Bond Lawyers, the Texas Council of School Board Attorneys, and the Texas City Attorney's Association.

The J. Ramirez Law Firm also manages a reasonable case load in the areas of construction law, architects & engineers and real estate, having represented public entities and contractors in construction design and litigation cases, payment and performance bond claims, breach of contract, breach of warranty and first party property insurance claims. He has also represented clients in appellate cases.

Over the pasts thirty years, Mr. Ramirez has served as counsel to various local governmental entities including cities, counties and school districts. Currently, he represents, in a general capacity, the Pharr San Juan Alamo ISD, South Texas College and The Economic Development Corporation of Weslaco.

### Expert Opinion & Report

I have been engaged as counsel to the Pharr San Juan Alamo ISD. In that regard, I provide general legal services to the school district upon assignment of specific matters and am compensated at the rate of $200 per hour.

I was assigned the matter of reviewing the school district's substantial cost increases resulting from change orders to contracted work to Texas Descon Construction during the construction of district Jefferson T STEM High School Phases I and II (the "Project").

In connection with that review, the school district assigned two of its employees, Messrs. Rene Campos, Finance Dept. and Agustin Rodriguez, Facilities Dept. to the matter. I have worked with these gentlemen in reviewing numerous documents related to the design and construction of the Project. The school district filed a lawsuit, originally against ERO Architects, the design architect on the Project and Texas Descon Construction. After initial discovery, the school district joined additional defendants: Frank Lam & Associates, structural engineers, a consultant to ERO Architects, and the school district's property insurance carrier, Chubb Insurance, and its consultant, Rimkus Engineers.

From the inception of this case, I have been involved in gathering documentation and evidence regarding the facts of the case, interviewing witnesses and developing theories of recovery for the school district's claims. I have also communicated with and obtain reports from expert witnesses. I have prepared and filed the lawsuit in this, along with associates in the law firm, engaged in discovery, obtained, reviewed and organized thousands of documents.

The attached ledger contains fees and costs incurred in connection with this case.

It is my opinion that the attorney time spent and the hourly rates billed for work on this case have been reasonable and necessary in light of the extent of the demands required of this case. I have practiced for over 30 years in South Texas and believe that the hourly rates which we have charged for this work are reasonable for lawyers with the education and experience which we possess.

Jesus Ramirez

**Appraisal Report of**

An Existing Educational Building
(aka Stambaugh Building)
714 E. US Business Highway 83
Pharr, Texas  78577

**Prepared For**

Mr. Rene Campos
PHARR-SAN JUAN-ALAMO ISD
601 East Kelly Avenue
Pharr, Texas  78577

**Date of Report**

October 8, 2014

Aguirre & Patterson, Inc.

Real Estate Appraisal & Consulting Services

# Aguirre & Patterson, Inc.

### REAL ESTATE APPRAISERS
### JOE W. PATTERSON, MAI, SRA

BETO R. AGUIRRE, Associate
CONNIE C. FIELDER, Associate
JOE E. CHEANEY, Associate
BILLY G. DOYLE, Associate
KIM E. RANSON, Associate
TISH KEATING, Associate
JAIME J. AGUIRRE, Associate

CHRIS THOMPSON, Associate
ELIZABETH RUBIO, Associate
IRENE B. THOMPSON, Associate
BRIAN K. PAYNE, Associate
GRISELDA GUERRERO, Associate
CAREN RAMIREZ, Associate
JULE KIRBY, Associate

October 8, 2014

Mr. Rene Campos
PHARR-SAN JUAN-ALAMO ISD
601 East Kelley Avenue
Pharr, Texas 78577

RE: Retrospective Appraisal Report of the Stambaugh Building located at 714 E. US Business
Highway 83, Pharr, Texas 78577.

Dear Mr. Campos:

In accordance with your request, we submit an appraisal report of the above referenced
property, which is identified on page 11 of the attached report. The property was inspected on
September 29, 2014.

The purpose of the appraisal is to provide the appraisers' opinion of the _retrospective market value_ estimate of the subject property as of the effective date indicated in the appraisal and
according to the definitions contained in the written report and subject to the Underlying
Assumptions and Limiting Conditions contained herein. This appraisal is intended to conform to the
generally accepted appraisal standards as evidenced by the Uniform Standards of Professional
Appraisal Practice.

As a result of the appraisal and analysis, it is the appraisers' opinion that the retrospective
market value of the subject, as of February 1, 2012, excluding FF&E, was as follows:

THREE HUNDRED AND FIFTY-THREE THOUSAND DOLLARS
($353,000.00)

Based upon the appraisers' analysis of past events assuming a competitive and open market, the
appraisers estimate a reasonable marketing period for this type of property at the market value
estimated in this report to not exceed twenty-four months.

Based upon the appraisers' analysis of past events assuming a competitive and open market, the
appraisers estimate a reasonable exposure period for this type of property at the market value
estimated in this report would not have exceeded twenty-four months.

Inter National Bank
October 8, 2014

The supporting data and the analysis and conclusions upon which this value is based are contained in the accompanying report.

Respectfully submitted,

Joe Patterson, MAI, SRA
President, TX-1321595-G

Irene B. Thompson
Associate, TX-1336175-G

TABLE OF CONTENTS

TITLE PAGE........................................................................................................................ 1
LETTER OF TRANSMITTAL ................................................................................................ 2
TABLE OF CONTENTS ...................................................................................................... 4
CERTIFICATION .................................................................................................................. 6
SUMMARY OF IMPORTANT DATA .................................................................................. 7
PREFACE ........................................................................................................................... 10
PREMISES OF THE APPRAISAL ....................................................................................... 11
    IDENTIFICATION OF THE PROPERTY .......................................................................... 11
    PROPERTY RIGHTS APPRAISED ................................................................................... 11
    INTENDED USE OF THE APPRAISAL ........................................................................... 11
    INTENDED USER OF THE APPRAISAL ......................................................................... 11
    SCOPE OF THE APPRAISAL ......................................................................................... 11
    MARKET VALUE DEFINED ............................................................................................ 12
LIMITING CONDITIONS AND ASSUMPTIONS ............................................................. 13
PHARR CITY ANALYSIS ................................................................................................... 19
    CITY OF PHARR MAP .................................................................................................. 28
SUBMARKET ANALYSIS ................................................................................................... 29
    SUBMARKET MAP ........................................................................................................ 30
SITE ANALYSIS .................................................................................................................. 31
DESCRIPTION OF IMPROVEMENTS .............................................................................. 32
    SPECIFIC CONSTRUCTION DESCRIPTION: ............................................................... 32
    COMMENTS REGARDING CONDITION AND ENVIRONMENTAL CONCERNS ....... 33
    BUILDING BREAKDOWN OF COST TO REPAIR PHYSICAL DEFICIENCIES: ........... 34
    BUILDER'S COST ESTIMATE: ....................................................................................... 35
    IMPROVEMENT SKETCH .............................................................................................. 42
    SUBJECT INTERIOR FLOOR PLAN ............................................................................... 43
    GOOGLE EARTH AERIAL PHOTOGRAPH ................................................................. 44
    SUBJECT PHOTOGRAPHS ........................................................................................... 45
ANALYSIS AND STATEMENT OF HIGHEST AND BEST USE ......................................... 50
APPRAISAL PROCESS ....................................................................................................... 53
INCOME CAPITALIZATION APPROACH ........................................................................ 54
    CONTRACT RENT ........................................................................................................ 54
    COMPARABLE RENTAL DATA .................................................................................... 54
    COMPARABLE RENT GRID .......................................................................................... 58
    ALLOWANCE FOR VACANCY AND COLLECTION LOSS .......................................... 59
    OPERATING EXPENSES ................................................................................................ 59
    PROJECTED OPERATING STATEMENT ....................................................................... 60
    CAPITALIZATION ANALYSIS ....................................................................................... 60
    MORTGAGE AND EQUITY BAND OF INVESTMENT CAPITALIZATION .................... 62
    ESTIMATED LAND COMPONENT .............................................................................. 65
    ESTIMATED MARKET VALUE BY INCOME CAPITALIZATION APPROACH ................ 66
SALES COMPARISON APPROACH .................................................................................. 67
    DEFINITION AND SCOPE ............................................................................................ 67

# TABLE OF CONTENTS (CONTINUED)

COMPARABLE SALES.................................................................................................68
COMPARABLE SALES ANALYSIS .........................................................................73
ESTIMATED AS IS VALUE BY SALES COMPARISON APPROACH.....................73
CORRELATION.........................................................................................................74
CERTIFICATE OF VALUE.........................................................................................75
ADDENDUM ..........................................................................................................76
QUALIFICATIONS OF THE APPRAISER....................................................................78

CERTIFICATION

I certify that, to the best of my knowledge and belief:

✓ The statements of fact contained in this report are true and correct.

✓ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

✓ I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

✓ I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

✓ My engagement in this assignment was not contingent upon developing or reporting predetermined results.

✓ My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

✓ I have not performed an appraisal related service of the subject property within the three years prior to this assignment.

✓ The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute.

✓ The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

✓ The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

✓ I have (or have not) made a personal inspection of the property that is the subject of this report.

✓ No one provided significant real property appraisal assistance to the persons signing this certification.

✓ As of the date of this report, Joe W. Patterson, MAI, SRA has completed the continuing education program of the Appraisal Institute.


Joe Patterson, MAI, SRA
TX-1321595-G
Signed: October 8, 2014

___Did_X_Did Not Physically
Inspect the Property


Irene B. Thompson
TX-1336175-G
Signed: October 8, 2014

_X_Did___Did Not Physically
Inspect the Property

---

SUMMARY OF IMPORTANT DATA

TYPE PROPERTY:  Existing Educational Building

LOCATION:  714 E. US Business Highway 83, Pharr, Texas  78577

DESCRIPTION:  The subject consists of a building that is commonly referred to as the Stambaugh Building.  The appraiser's value estimate is for the building only.  No land component is included in the retrospective value opinion.  The building was originally constructed of brick veneer over concrete block perimeter walls, on a grade-level concrete slab foundation with a modified built-up roof sometime in early 1980's.  The exact date is unknown.  The interior of the building was partitioned into several classrooms.  It is understood that the subject building was not in use as of the effective date.

SITE SIZE:  Not applicable. At the request of the client, the appraiser's retrospective value opinion includes the building value only.

ZONING:  PSJA (school use).

RETROSPECTIVE MARKET VALUE OPINION ...........................................................................$353,000.00

EFFECTIVE DATE OF RETROSPECTIVE MARKET VALUE OPINION ................................February 1, 2012

COMMENTS REGARDING EFFECTIVE DATE:  The client has requested the appraisers provide a retrospective value opinion of the subject building.  A Retrospective Value is defined as "a value opinion effective as of a specified historical date.  The term does not define a type of value.  Instead, it identifies a value opinion as being effective at some specific prior date."[1]

PRESENT USE/USE APPRAISED:  As of the effective date, the subject was improved with a classroom building.  The appraisers' value estimate reflects the highest and best use.

MARKETING  PERIOD:  With  adequate  advertising,  exposure  and  aggressive  marketing,  the appraisers estimate the marketing period not to exceed twenty-four months.  This is based primarily on marketing data presented in the Multiple Listing Service and the appraisers' knowledge of this particular submarket.

EXPOSURE PERIOD:  Based upon the appraisers' analysis of past events assuming a competitive and open market, the appraisers estimate a reasonable exposure period for this type of property at the market value estimated in this report would not have exceeded twenty-four months.

TERMS: Typical terms would be 10% to 30% down; 5% to 10% interest rate; amortized over a period of 15 to 30 years; term of 3 to 30 years.

ENVIRONMENTAL CONCERNS:  The appraisers have been informed that the subject building had asbestos containing material as of the effective date of the retrospective value opinion.

---

[1] *The Dictionary of Real Estate Appraising*, 5th Edition,  The Appraisal Institute: Chicago, IL, 2010.

SUMMARY OF IMPORTANT DATA (continued)

According to an Asbestos Survey Report dated May 9, 2011, conducted by Envirotest, Ltd. ACM was discovered in the floor tile. The asbestos-containing floor tile was in good condition and considered non-friable. An assumption is made by the appraisers that as of the effective date, the condition of the ACM was the same.

OWNERSHIP HISTORY: According to the Hidalgo County Appraisal District, the current owner of record is PSJA ISD. The subject does not appear to have changed ownership not been listed for sale through the local MLS within the past three years. The further information was discovered by the appraisers in the normal course of business.

PERSONAL PROPERTY: This appraisal does not include furniture, fixtures, or equipment in the market value estimate. The exclusion of these items is estimated to have no impact on the market value estimate. The appraisal does not include any intangible items such as trademarks or good will.

TAXES: The subject property is owed by a tax exempt entity.

MARKET TRENDS: Signs of recent sales activity and increased lending indicate that the local real estate market is recovering from a stagnant economic climate. This trend of recovery is expected to continue.

PERTINENT INFORMATION: No environmental study as of the effective date was provided.

STATEMENT OF COMPLIANCE: This appraisal is intended to conform to generally accepted appraisal standards as evidenced by the Uniform Standards of Professional Appraisal Practice.

STATEMENT OF COMPETENCY: The appraisers have a total of over 59 years experience in the real estate appraisal business, which includes the appraisal of similar projects; therefore, have attained the necessary knowledge and experience to competently complete this assignment (See Qualifications).

DATA SOURCES: Sources used in investigating comparables sales include local multiple listing services, national commercial property listing services, lenders, realtors, deed records, builders, developers, title companies, individuals and other appraisers.

INCOME PROPERTY PROVISION: Not applicable.

CONTINGENCY PROVISION: The appraisers certify that their compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event. Furthermore, this appraisal assignment is not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

DISCOUNTING PROCESS: The discounting process is only considered applicable when: 1) the subject is proposed construction and it is estimated that the construction will take over six

SUMMARY OF IMPORTANT DATA (continued)

months to complete; 2) the subject is partially leased and the absorption period is estimated to be more than six months; 3) the subject is being leased at other than market rent; or 4) the subject is a large project with several unsold units. The discounting process not deemed necessary in the valuation of the subject property.

STATEMENT CONCERNING DISABILITIES ACT: The Americans with Disabilities Act ("ADA") became effective January 26, 1992. The appraisers have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this fact could have a negative effect upon the value of the property. Since the appraisers have no direct evidence relating to this issue, possible noncompliance with the requirements of ADA in estimating the value of the property has not been considered.

CENSUS TRACT: According to the U.S. Geological Survey Department, the subject is located in Census Tract 214.01, Hidalgo County, Texas.

FLOOD DESIGNATION: The appraisers are not experts in determining the flood zone designation for the subject. No responsibility is assumed on our part for accurately determining the subject's flood zone. If an official survey or flood designation certificate is not provided, the appraisers estimate flood designation based on available FEMA flood maps and/or recorded subdivision maps. Because some of the information may be inconclusive, the appraisers' opinion of value is predicated on the assumption that the flood zone indicated herein is correct. According to FIRM Panel No. 480347 0005 C, revised October 19, 1982, the subject is located within flood zone "B" (subject to survey), which is NOT a special flood hazard area.

PROPERTY INSPECTION DISCLAIMER: The appraisers are not licensed property inspectors. An inspection conducted by an appraiser is not the equivalent of an inspection by an inspection professional such as a structural engineer or a licensed property inspector. The extent of the appraiser's inspection process is an aspect of the scope of work, and may vary based on assignment conditions and the intended use of the assignment results. The appraiser's inspection is limited to those things readily observable without the use of special testing or equipment. The Appraiser has inspected as far as possible, by observation, the improvements and land; however, it was not possible to personally observe conditions beneath the soil or other hidden components. No representations are made herein as to these matters unless specifically stated and considered in the report.

DATE OF THE REPORT: The assemblage of the descriptions, analysis, and conclusions occurred on or about October 8, 2014, and is considered the date of the report.

PREFACE

An appraisal is a type of research into the laws of probabilities with respect to real estate transactions. The insurance industry can reliably predict that out of so many exposures a certain number of losses will occur. They, of course, cannot predict the exact insured on whom this loss will fall. The appraiser can predict the general real estate market with much greater certainty than he can the value of a specific piece of property.

The appraiser who estimates market value of a particular property is merely stating his opinion of what such property most likely will bring in dollars if it is exposed for sale on the open market allowing a reasonable time for buyers to inspect and investigate before making their offers.

Through the appraiser's education, training, experience, and integrity he is able to relate how sellers and buyers have acted in the past into a forecast of how they most likely will act to the particular property in question. Because each particular property is different and unique, he must by necessity make adjustments in making comparisons to arrive at his final conclusions.

An appraisal does not necessarily set the price to be paid. It should be used to form a basis of negotiation between owner and prospective purchaser or between lender and borrower or between condemnor and condemnee.

This appraisal is not guaranteed. It cannot be proven. If the property brings the estimated value herein, or if a mortgage is predicated thereon, or if a settlement is made as a result of such estimated value, it merely means the parties concerned agreed with the appraiser. The parties may disagree and this does not disprove the estimated value. It merely means a difference of opinion.

Prices paid and awards made often reflect sentiment, compassion, sympathy, bias, politics, personal interest, specific needs, lack of understanding and other factors not considered by the impartial appraiser. The final opinion of value is the result of a professional opinion and analysis of a considerable quantity of physical and economic facts. The methods used in the analysis are explained in the appraisal report. The reader is invited to draw his own conclusions in the event of a difference of interpretation of the facts within the report.

This appraisal is made subject to certain basic assumptions, definitions and limiting conditions. These should be read by the reviewer.

PREMISES OF THE APPRAISAL

Identification of the Property

The subject property consists of the building commonly known as the Stambaugh Building which is located at 714 E. US Business Highway 83. *The land is not included in the Retrospective Value Opinion; therefore there is no specific legal description.*

Property Rights Appraised

This appraisal requires that the ownership of the subject property include all rights to title that may be legally owned. Such ownership is termed "fee simple" and said ownership is the property rights appraised in this report, excluding oil, gas and other mineral rights and subject to easements of record.

Intended Use of the Appraisal

The intended use of this appraisal is for client use in resolving a legal matter pertaining to the subject building improvements.

Intended User of the Appraisal

The intended user of the appraisal is the PSJA Independent School District.

Scope of the Appraisal

At the client's request, an appraisal report of the subject property is prepared which conforms to generally accepted appraisal standards as evidenced by the Uniform Standards of Professional Appraisal Practice promulgated by the Appraisal Standards Board of the Appraisal Foundation and the Guide Notes to the Standards of Professional Appraisal Practice adopted by the Appraisal Institute. Per agreement with the client, the appraisers' engagement includes the following: perform a physical inspection of the subject property as of the current date; examine photographs and demolition plans depicting the subject as of February 1, 2012; analyze data such as demographics, supply and demand, property size, location and zoning; perform a highest and best use analysis of the subject property; consider all approaches to value and complete the applicable approaches to value, of which the Income Capitalization Approach and the Sales Comparison Approach to value are considered applicable and include research and analysis of comparable improved sales and rental data, vacancy and occupancy rates, operating expenses,

PREMISES OF THE APPRAISAL (continued)

and discount rates; and, analyze and correlate the data and present the conclusion and opinion of retrospective market value in a narrative appraisal report format.

<u>Market Value Defined</u>

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.  Buyer and seller are typically motivated.

2.  Both parties are well informed or well advised, and acting in what they consider their best interests.

3.  A reasonable time is allowed for exposure in the open market.

4.  Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto.

5.  The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Sources: The Office of the Comptroller of Currency 12 C.F.R., Part 34, Subpart C-1 Appraisals 34-42 Definition (g); and, The Code of Federal Regulations, Title 12, Chapter III, Subchapter B, Sect. 323.2(g)

## LIMITING CONDITIONS AND ASSUMPTIONS

By this notice, all persons and firms reviewing, utilizing or relying on this report in any manner bind themselves to accept these assumptions and limiting conditions. Do not use this report if you do not so accept. These conditions are a part of the appraisal report, they are a preface to any certification, definition, fact or analysis, and are intended to establish as a matter of record that the appraiser's function is to provide a present market value indication for the subject property based upon the appraiser's observations as to the subject property and real estate market. This appraisal report is an economic study to estimate value as defined in it. It is not an engineering, construction, legal or architectural study nor survey and expertise in these areas, among others, is not implied.

### 1. LIMIT OF LIABILITY:

The liability of the Patterson firm and employees and affiliated independent contractors is limited to the client only and to the fee actually received by appraiser (total per appraisal). Further, there is no accountability, obligation, or liability to any third party. If this report is placed in the hands of anyone other than client, the client shall make such party aware of all limiting conditions and assumptions of the assignment and related discussions. The Appraiser is in no way to be responsible for any costs incurred to discover or correct any deficiencies of any type present in the property; physically, financially, and/or legally. In the case of limited partnerships or syndication offerings or stock offerings in real estate, client agrees that in case of lawsuit (brought by lender, partner or part owner in any form of ownership, tenant, or any other party), any and all awards, settlements of any type in such suit, regardless of outcome, client will hold Appraiser completely harmless in any such action.

### 2. COPIES, PUBLICATION, DISTRIBUTION, USE OF REPORT:

Possession of this report or any copy thereof does not carry with it the right of publication, nor may it be used for other than its intended use; the physical report(s) remain the property of the Appraiser for the use of the client, the fee being for the analytical services only.

The Bylaws and Regulations of the American Institute of Real Estate Appraisers of the National Association of Realtors require each Member and Candidate to control the use and distribution of each appraisal report signed by such Member or Candidate; except as hereinafter provided, the client may distribute copies of this appraisal report in its entirety to such third parties as he may select; however, selected portions of this appraisal report shall not be given to third parties without the prior written consent of the signatories of this appraisal report. Neither all nor any part of this appraisal report shall be disseminated to the general public by the use of advertising media, public relations, news, sales or other media for public communication without the prior written consent of appraiser. (See last item following this list for client agreement-consent).

### 3. CONFIDENTIALITY:

This appraisal is to be used only in its entirety and no part is to be used without the whole report. All conclusions and opinions concerning the analysis as set forth in the report were prepared by the Appraiser(s) whose signature(s) appear on the appraisal report, unless indicated as "Review Appraiser". No change of any item in the report shall be made by anyone other than the Appraiser and/or officer of the firm. The appraiser and firm shall have no responsibility if any such unauthorized change is made.

LIMITING CONDITIONS AND ASSUMPTIONS (continued)

The Appraiser may not divulge the material (evaluation) contents of the report, analytical findings or conclusions, or give a copy of the report to anyone other than the client or his designee as specified in writing except as may be required by the American Institute of Real Estate Appraisers or the Society of Real Estate Appraisers as they may request in confidence for ethics enforcement, or by a court of law or body with the power of subpoena.

4. TRADE SECRETS:
This appraisal was obtained from Aguirre and Patterson, Inc. or related companies and/or its individuals or related independent contractors and consists of "trade secrets and commercial or financial information" which is privileged and confidential and exempted from disclosure under 5 U.S.C. 552 (b) (4). Notify the Appraiser(s) signing report or an officer of Aguirre and Patterson, Inc., of any request to reproduce this appraisal in whole or part.

5. INFORMATION USED:
No responsibility is assumed for accuracy of information furnished by work of or work by others, the client, his designee, or public records.   We are not liable for such information as the work of possible subcontractors. Be advised that some of the people associated with Aguirre and Patterson, Inc. and possibly signing the report are independent contractors. The comparable data relied upon in this report has been confirmed with one or more parties familiar with the transaction or from affidavit or other source thought reasonable; all are considered appropriate for inclusion to the best of our factual judgment and knowledge. An impractical and uneconomic expenditure of time would be required in attempting to furnish unimpeachable verification in all instances, particularly as to engineering and market-related information. It is suggested that the client consider independent verification as a prerequisite to any transaction involving sale, lease, or other significant commitment of funds to the subject property.

6. TESTIMONY, CONSULTATION, COMPLETION OF CONTRACT FOR APPRAISAL SERVICE:
The contract for appraisal, consultation or analytical service is fulfilled, and the total fee is payable upon completion of the report. The Appraiser(s) or those assisting in preparation of the report will not be asked or required to give testimony in court or hearing because of having made the appraisal, in full or in part, nor engage in post appraisal consultation with client or third parties except under separate and special arrangement and at additional fee. If testimony or deposition is required because of any subpoena, the client shall be responsible for any additional time, fees, and charges regardless of issuing party.

7. EXHIBITS:
The sketches and maps in this report are included to assist the reader in visualizing the property and are not necessarily to scale. Various photos, if any, are included for the same purpose as of the date of the photos. Site plans are not surveys unless shown from separate surveyor.

8.   LEGAL, ENGINEERING, FINANCIAL, STRUCTURAL, OR MECHANICAL NATURE HIDDEN COMPONENTS, SOIL:
The appraiser and/or firm have no responsibility for matters legal in character or nature, nor of any architectural, structural, mechanical, or engineering nature. No opinion is rendered as to the title, which is presumed to be good and merchantable. The property is appraised as if free and clear, unless otherwise stated in particular parts of the report. The legal description is assumed to

LIMITING CONDITIONS AND ASSUMPTIONS (continued)

be correct as used in this report as furnished by the client, his designee, or as derived by the Appraiser.

Please note that no advice is given regarding mechanical equipment or structural integrity or adequacy, nor soils and potential for settlement, drainage, and such (seek assistance from qualified architect and/or engineer) nor matters concerning liens, title status, and legal marketability (seek legal assistance), and such. The lender or owner may wish to require mechanical or structural inspections by qualified and licensed contractor, civil or structural engineer, architect, or other expert.

The Appraiser has inspected as far as possible, by observation, the land and the improvements; however, it was not possible to personally observe conditions beneath the soil or hidden structural, or other components. We have not critically inspected mechanical components within the improvements and no representations are made herein as to these matters unless specifically stated and considered in the report. The value estimate considers there being no such conditions that would cause a loss of value. The land or the soil of the area being appraised appears firm, however, subsidence in the area is unknown. The Appraiser(s) do not warrant against this condition or occurrence of problems arising from soil conditions.

The appraisal is based on there being no hidden, unapparent, or apparent conditions of the property site, subsoil, or structures or toxic materials, which would render it more or less valuable. The appraiser and firm have no responsibility for any such conditions or for any expertise of engineering to discover them. All mechanical components are assumed to be in operable condition and status standard for properties of the subject type. Conditions of heating, cooling, ventilating, electrical and plumbing equipment is considered to be commensurate with the conditions of the balance of the improvements unless otherwise stated. No judgment may be made by us as to adequacy of insulation, type of insulation, or energy efficiency of the improvements or equipment, which is assumed standard for subject age and type.

If the Appraiser has not been supplied with a termite inspection, survey or occupancy permit, no responsibility or representation is assumed or made for any costs associated with obtaining same or for any deficiencies discovered before or after they are obtained. No representation or warranties are made concerning obtaining the above mentioned items.

The Appraiser has no responsibility for any costs or consequences arising due to the need, or the lack of need for flood hazard insurance. An Agent for the Federal Flood Insurance Program should be contacted to determine the actual need for Flood Hazard Insurance.

9. LEGALITY OF USE:
The appraisal is based on the premise that, there is full compliance with all applicable federal, state and local environmental regulations and laws unless otherwise stated in the report; further, that all applicable zoning, building, use regulations and restrictions of all types have been complied with unless otherwise stated in the report; further, it is assumed that all required licenses, consents, permits, or other legislative or administrative authority, local, state, federal and/or private entity or organization have been or can be obtained or renewed for any use considered in the value estimate.

LIMITING CONDITIONS AND ASSUMPTIONS (continued)

10. COMPONENT VALUES:
The distribution of the total valuation in this report between land and improvements applies only under the existing program of utilization. The separate valuations for land and building must not be used in conjunction with any other appraisal and are invalid if so used.

11. AUXILIARY AND RELATED STUDIES:
No environmental or impact studies, special market study or analysis, highest and best use analysis study or feasibility study has been requested or made unless otherwise specified in an agreement for services or in the report.

12. DOLLAR VALUES, PURCHASING POWER:
The market value estimated, and the costs used, are as of the date of the estimate of value. All dollar amounts are based on the purchasing power and price of the dollar as of the date of the value estimate.

13. INCLUSIONS:
Furnishings and equipment or personal property of business operations except as specifically indicated and typically considered as part of real estate, have been disregarded with only the real estate being considered in the value estimate unless otherwise stated. In some property types, business and real estate interests and values are combined.

14. PROPOSED IMPROVEMENTS, CONDITIONED VALUE:
Improvements proposed, if any, on or off-site, as well as any repairs required are considered, for purposes of this appraisal to be completed in good and workmanlike manner according to information submitted and/or considered by the appraisers. In cases of proposed construction, the appraisal is subject to change upon inspection of property after construction is completed. This estimate of market value is as of the date shown, as proposed, as if completed and operating at levels shown and projected.

15. VALUE CHANGE, DYNAMIC MARKET, INFLUENCES, ALTERATION OF ESTIMATE BY APPRAISER:
The estimated market value, which is defined in the report, is subject to change with market changes over time; value is highly related to exposure, time, promotional effort, terms, motivation, and conditions surrounding the offering. The value estimate considers the productivity and relative attractiveness of the property physically and economically in the marketplace.

In cases of appraisals involving the capitalization of income benefits the estimate of market value or investment value or value in use is a reflection of such benefits and Appraiser's interpretation of income and yields and other factors derived from general and specific client and market information. Such estimates are as of the date of the estimate of value; they are thus subject to change as the market and value is naturally dynamic.

The "Estimate of Market Value" in the appraisal report is not based on whole or in part upon the race, color or national origin of the present owners or occupants of the properties in the vicinity of the property appraised.

LIMITING CONDITIONS AND ASSUMPTIONS (continued)

The appraisal report and value estimate is subject to change if physical or legal entity or financing is different than that envisioned in this report.

## 16. MANAGEMENT OF THE PROPERTY:
It is assumed that the property which is the subject of this report will be under prudent and competent ownership and management; neither inefficient nor super-efficient.

## 17. CONTINUING EDUCATION CURRENT:
The Appraisal Institute conducts a voluntary program of continuing education for its designated members; MAI and SRA Designates who meet the minimum standards of this program are awarded periodic educational certification and; MAI(s) signing the report is/are currently under this program.

## 18. FEE:
The fee for this appraisal or study is for the service rendered and not for the time spent on the physical report or the physical report itself. Amount or payment of fee for services is not contingent on any result, approval amount or other estimates or statements.

## 19. INSULATION AND TOXIC MATERIALS:
In this appraisal assignment, the existence of potentially hazardous material used in the construction or maintenance of the building, such as the presence of urea-formaldehyde foam insulation, and/or the existence of toxic material or waste, or other environmental hazards, which may or may not be present on the property, has not been considered. The appraiser is not qualified to detect such substances. We urge the user of this report to retain an expert in this field if desired. If such is present, the value of the property may be adversely affected and, therefore, must be reappraised at additional cost.

## 20. REVIEW:
Unless otherwise noted herein, named review Appraiser of/from Aguirre and Patterson, Inc. has reviewed the report only as to general appropriateness of technique and format, and has not necessarily inspected the subject or market comparable properties.

## 21. CHANGES, MODIFICATIONS:
The Appraisers and/or officers of Aguirre and Patterson, Inc., reserve the right to alter statements, analysis, conclusions or any value estimate in the appraisal if there becomes known to us facts pertinent to the appraisal process, which were unknown to us, when the report was finished.

## 22. FHLBB REGULATIONS:
Federal Home Loan Bank Board has special requirement for appraisals to be used by Savings and Loan Associations for some types of loans; this appraisal is not intended to be used for such unless specifically stated otherwise in the report. Any additional research, analysis, and report writing may be undertaken at a later date upon client request at additional fee for time and costs.

## 23. AFTER TAX ANALYSIS AND/OR VALUATION:
Any "after" tax income or investment analysis and resultant measures of return on investment are intended to reflect only possible and general market considerations, whether as part of estimating value or estimating possible returns on investment at an assumed value or price paid; note that the

LIMITING CONDITIONS AND ASSUMPTIONS (continued)

Appraiser(s) does not claim expertise in tax matters and advises client and any other using the appraisal to seek competent tax advice as the Appraiser is in no way to be considered a tax advisor or investment advisor.

24.   ACCEPTANCE OF, AND/OR USE OF, THIS APPRAISAL REPORT BY CLIENT OR ANY THIRD PARTY CONSTITUTES ACCEPTANCE OF THE ABOVE CONDITIONS.  APPRAISER LIABILITY EXTENDS ONLY TO STATED CLIENT, NOT SUBSEQUENT PARTIES OR USERS OF ANY TYPE, and the total liability of appraiser and firm is limited to the amount of fee received by Appraiser.

PHARR CITY ANALYSIS

<u>General</u>

The City of Pharr, established in 1909, is located in the lower Rio Grande Valley in Hidalgo County, Texas, approximately 150 miles south of Corpus Christi and 140 miles southeast of Laredo. Pharr enjoys all the same natural resources, physical attributes, agricultural, and commercial trends that the rest of the Lower Rio Grande Valley experiences.



Encompassing an area of approximately 20 square miles, the topography of the City and surrounding area is fairly level with an average elevation of 108 feet above sea level. The average annual temperature is 73 degrees Fahrenheit.

<u>Population Data & Growth Statistics</u>

According to the U.S. Census Bureau, the population of Pharr in 2010 was 70,400, a 50.9% increase from 2000 figures which indicated 46,660 persons. All indicators are for the population for Pharr to continue to increase.



The City of Pharr is located within the McAllen-Mission-Edinburg Metropolitan Statistical Area which is defined by the US Census Bureau as consisting of the County of Hidalgo. From 1990 to 2000, Hidalgo County indicated a 48.5% growth rate, which was the 7th fastest growing county in the state of Texas. The 2010 census figures are reporting 774,769 persons, which is a 36.1% increase from 2000 figures.





PHARR CITY ANALYSIS (continued)

Employment Activity & Sources

The major employers of the city are government, including the local school system, followed by retail trade, followed by the health care field. Other employers include produce and citrus shippers and accommodation and food services.

Transportation

Pharr is located at the intersection of the two main highways into and through the Valley, U.S. Highway 281 which runs north/south and leads directly into Mexico to the south, and San Antonio to the north, and U.S. Expressway 83 which runs east/west and leads directly toward Laredo to the west and Brownsville to the east. A Valley bus line provides ample public transportation locally. The area is served by the Missouri Pacific and Southern Pacific Railroads, which connect Corpus Christi and San Antonio with the Mexican rail system through Matamoros, Mexico. Pharr is only five minutes from Miller International Airport in McAllen, (adjacent to Pharr), which handles air travel to Corpus Christi, Houston and San Antonio as well as international flights to the interior of Mexico.

The only port of entry into Mexico within the Pharr city limits is the Pharr-Reynosa International Bridge, connecting U.S. Highway 281 to the City of Reynosa. Constructed in 1994, the Pharr International Bridge is one of the most technologically advanced border crossings in the United States. GAMA Rays and Fast & Secure Trade program, known as FAST are implemented by both the U.S. and Mexican Customs, which allows an expedited inspection of documents and cargo, and limits crossing time on the U.S.-Mexican border. As a result, the Pharr Bridge is quickly becoming a primary industrial port. As the bridge continues to draw more and more attention, development of industrial parks located in the southern sector of Pharr, and the surrounding areas is expected to continue to increase.

Recreation and Churches

The semi-tropical climate and ample rainfall combine to make Pharr very attractive to winter tourists and retirees, an industry that is growing at a steady rate. Recreational facilities for the area include fishing, boating and swimming in the Gulf of Mexico (Padre Island) and Falcon Lake, both some 65 miles from Pharr in opposite directions. There are many bird sanctuaries in the Valley along with a fine zoo, botanical gardens and parks. Golf is a sport enjoyed here at Pharr's

PHARR CITY ANALYSIS (continued)

Plantation South Golf Course. The City of Pharr has fine parks, an Olympic-sized swimming pool, stadium and gymnasium. The Pharr Recreation Department offers a variety of programs for the city's youth, including soccer, baseball, basketball, track and field, golf, tennis, ballet, guitar, karate, etc. There are at least nine churches within the City of Pharr, many of which organize additional community events and outreach programs.

Industrial Development

The City of Pharr is encouraging industrialization with the establishment of the several industrial parks located on South U.S. Highway 281 near the site of the Pharr International Bridge. The Pharr Economic Development Corporation, a non-profit organization, has had a positive impact on drawing in business and industry development into the Pharr-Reynosa area and was responsible for developing three industrial parks, the Pharr Industrial Park, the Capote Industrial Park, and Keystone Industrial Park, and has recently begun construction on a fourth industrial development, the Pharr Produce District which is expected to be completed in 2014. The southern area of Pharr has witness significant industrial growth in the past five years as a result.

Schools

Pharr is within the Pharr, San Juan and Alamo Independent School District which has 26 elementary schools, 8 middle schools, 4 high schools, and 5 alternative schools. Total enrollment is over 31,000 students. Of these schools, 14 elementary, 4 middle schools, and 2 high schools are situated within the City of Pharr. The University of Texas Pan American is located in the nearby City of Edinburg, approximately 7 miles from Pharr; and, South Texas College is located within the City of McAllen, approximately 11 miles away.

Government

Pharr operates under a city manager, mayor and city council form of government. It has a police force, a paid and volunteer fire department, and in addition, supplies the usual city services of water, sewer, garbage, and trash pickup. The zoning ordinance that has been adopted is the Southern Standard Building Code. No rent controls are in effect. The city has public housing projects, which are well managed. The city receives two percent sales tax revenue. This is bringing an increasing amount every year and this revenue has been one reason property taxes have

PHARR CITY ANALYSIS (continued)

remained stable in spite of higher city costs.  The City has been politically stable over the past years and has responded well to the demand for municipal services.

## Housing Development

Tourists and retirees are rapidly adding to the local people's demands for housing and all supporting facilities.  In the City of Pharr, within the past few years, we have seen the development of mobile home parks, apartment houses, new condominium projects and numerous single-family subdivisions. Demand is thus evidenced for various types of real estate.

## Economic Indicators

The MetroMonitor, has been tracking the economic recession and recovery in America's 100 largest metropolitan areas.  According to recent reports, "by the fourth quarter of 2012 only 14 metro areas—six of which are in Texas—had fully recovered their pre-recession employment levels. They were: Austin, Charleston, Dallas, El Paso, Houston, Knoxville, McAllen, Oklahoma City, Omaha, Pittsburgh, San Antonio, San Jose, and Washington."[2]

CNN Money, among others have identified the McAllen MSA as one of "America's Most Recession-Proof Cities" and according to the Council for Community and Economic Research in January 2012, the McAllen MSA was identified as the 4th least expensive city in the United States to live in, with a cost of living index of 15.5% below the national average.

The McAllen Chamber of Commerce publishes the McAllen Area Economic Pulse which measures the economic activity for McAllen, Mission, Pharr, and Edinburg in the following areas: retail sales, motor vehicle sales, lodging tax receipts, airline boarding, construction permits, new home permits, home sales, average home sale price, Hidalgo bridge crossings, peso exchange rate, wage and salary employment, and unemployment.  The data from the Chamber further supports the trends witnessed in sales tax and building permits, that being a trend for a tempered recovery. The Chamber's report is provided on the following pages.

---

[2] http://www.brookings.edu/research/interactives/metromonitor#M32580-this-qtr-employment-nv

PHARR CITY ANALYSIS (continued)



## PHARR CITY ANALYSIS (continued)

| | ECONOMIC INDICATORS | THIS YEAR June 2014 | LAST YEAR June 2013 | % CHANGE 2013 - 2014 |
|---|---|---|---|---|
| **The McAllen Area Economy** | Retail Sales ($000's - June in 1995$) | $312,517 | $280,726 | 11.3% |
| | Retail Sales ($000's - 2nd Quarter) | $957,512 | $912,727 | 4.9% |
| | Retail Sales ($000's - Year-to-Date) | $1,976,722 | $1,909,019 | 3.5% |
| | Dollars Spent on Auto Purchases ($000's - June in 1995$) | $126,739 | $120,573 | 5.1% |
| | Dollars Spent on Auto Purchases ($000's - 2nd Quarter) | $368,681 | $338,932 | 8.8% |
| | Dollars Spent on Auto Purchases ($000's - YTD) | $742,453 | $690,913 | 7.5% |
| | Lodging Tax Receipts (June) | $309,619 | $285,146 | 8.6% |
| | Lodging Tax Receipts (2nd Quarter) | $990,276 | $869,314 | 13.9% |
| | Lodging Tax Receipts (YTD) | $2,048,024 | $1,869,238 | 9.6% |
| | Airline Boardings (June) | 39,391 | 34,778 | 13.3% |
| | Airline Boardings (2nd Quarter) | 106,757 | 94,411 | 13.1% |
| | Airline Boardings (YTD) | 191,888 | 174,684 | 9.8% |
| | Value All Construction Permits (June) | 38,632,189 | 53,060,512 | -27.2% |
| | Value All Construction Permits (2nd Quarter) | $114,435,769 | $176,820,748 | -35.3% |
| | Value All Construction Permits (YTD) | $220,625,706 | $281,800,907 | -21.7% |
| | New Home Permits (June) | 114 | 96 | 18.8% |
| | New Home Permits (2nd Quarter) | 354 | 308 | 14.9% |
| | New Home Permits (YTD) | 655 | 551 | 18.9% |
| | Home Sales (June) | 221 | 195 | 13.3% |
| | Home Sales (2nd Quarter) | 647 | 622 | 4.0% |
| | Home Sales (YTD) | 1,172 | 1,147 | 2.2% |
| | Average Home Sale Price (June) | 141,026 | 142,175 | -0.8% |
| | Average Home Sale Price (2nd Quarter) | $136,216 | $135,213 | 0.7% |
| | Average Home Sale Price (YTD) | $132,105 | $128,203 | 3.0% |
| | Hidalgo/Anzalduas Bridge Crossings (June) | 429,205 | 442,465 | -3.0% |
| | Hidalgo/Anzalduas Bridge Crossings (2nd Quarter) | 1,311,806 | 1,338,627 | -2.0% |
| | Hidalgo/Anzalduas Bridge Crossings (YTD) | 2,602,297 | 2,628,377 | -1.0% |
| | Peso/Dollar Exchange Rate (June) | $12.60 | $12.75 | -1.19% |
| | **Employment** | | | |
| | Wage & Salary Employment (June) | 237,600 | 234,600 | 1.3% |
| | Wage & Salary Employment (YTD Avg) | 237,765 | 233,785 | 1.7% |
| | Unemployment Rate (June) | 9.6 | 11.4 | -15.8% |
| | Unemployment Rate (YTD Average) | 9.5 | 11.0 | -13.2% |
| | | | | |
| | INDEX - May (Base=100 Jan 1996) | 181.6 | 178.5 | 1.7% |

**Key Points**

- The McAllen economy continued to improve through mid-year 2014 with the McAllen Economic Index rising to 181.6 in June up from 180.9 in May, and up 1.7% from the June 2013 MEI of 178.5. The June 2014 index value is the highest since November 2008, and is now down by less than 5% compared to the all-time McAllen Economic Index peak of 190.6 achieved in January 2008.

- The economy improved at a faster rate in the first half of the year and in the second quarter, with the McAllen Economic Index from January-June increasing at an annualized rate of 2.5%, and growing at a 3.5% annualized pace in the second quarter. Most sectors of the McAllen metro area economy which serve as components of the McAllen Economic Index are improved at the mid-point 2014, with only total construction (building permits issued) and border crossings down through June compared to year-ago levels.

- General real (inflation-adjusted) spending per monthly sales tax receipts was up by nearly 5% in the second quarter compared to the second quarter of a year ago, and the June monthly total was up a sharp 11.3% compared to the June 2014 total. Midway through the year, taxable spending is up by a solid 3.5% compared to the first six months of last year.

- Employment remaining at a record level in the McAllen metro area but the pace of growth has slowed through mid-year with the number of jobs in June increasing by only about 1.3% compared to June of a year ago reflecting the addition of 3,000 jobs over the last 12 months. The unemployment rate indicates a normal seasonal uptick from May to June, but the correct measure is June of this year compared to June of last (or any prior June), and the unemployment rate of 9.6% in June 2014 compares favorably with the 11.4% rate of unemployment in June of a year ago.

- Auto sales remain strong in McAllen, pushing ever deeper into record territory. Inflation-adjusted spending on new and used automobiles was up by nearly 9% in the second quarter (year-over-year), and by about 5% in June. Thus far in 2014, real auto spending is up by some 7.5% compared to the first six months of a year ago.

- The travel and tourism indicators suggest stout gains compared to year-ago levels, with hotel/motel tax receipts and airport passenger enplanements both up by nearly 10% compared to year-ago levels.

- Construction activity is down in 2014 posting year-over-year declines for the month, quarter, and year-to-date. The $220.6 million in building permits issued thus far in 2014 is off by nearly 22% compared to the January-June total in 2013, and in fact is the lowest total for the first six months of the year since 2010. Home building is on the rise, however, with the number of new single-family residence construction permits up by 15% for the quarter and about 19% for the year-to-date. And in fact the 655 permits issued in McAllen, Edinburg, Mission, and Pharr is the highest January-June total since 2010.

- The McAllen metro area residential real estate market remains in healthy condition with modest increases in the number of homes sold at rising prices. The number of closed sales is up by only about 2% year-over-year, but that comes on top of a 6% gain through June of last year, and 17% gain through June of the prior year. The second quarter average price was flat compared to year-ago levels; however, the second quarter 2013 average home sale price was up by over 10% compared to the prior year. The real dollar volume of residential real estate sales activity is slowly but very steadily on the rise, and is up by a respectable 3% compared to the first six months of 2013.

PHARR CITY ANALYSIS (continued)

According to the Texas Employment Commission the unemployment rate for Pharr as of May 2014 was 7.3%. The rate for Hidalgo County for the same period was 8.6%. While the county's average annual jobless rate is higher than the state average, this is typical of the locale. Historically, unemployment rates increase in the winter and summer months with a decrease in unemployment typically seen in the fall and spring. This is attributed to seasonal decreases within the educational institutions related to the summer break and/or agricultural harvest periods; however, the national economic condition has in general resulted in higher rates than what was observed in 2008.



The Labor Market and Career Information Department of the Texas Workforce Commission examines and provides statistics for various metropolitan statistical areas. The LMCI's snapshot for the McAllen-Edinburg-Mission MSA is presented on the following page.

## PHARR CITY ANALYSIS (continued)



Aguirre & Patterson, Inc.
Appraisal Report of the Stambaugh Building

PHARR CITY ANALYSIS (continued)

Summary

In review we conclude the following:

1.  Pharr enjoys the benefits of a very productive agricultural region.

2.  The mild climate and plentiful recreational facilities are encouraging a rapidly increasing tourist trade.

3.  A plentiful work force and aggressive industrial recruiting are encouraging industrialization.

4.  The city is stable politically and ample educational opportunities are available.

5.  The City of Pharr is growing in population, in retail sales and in size and can be expected to widen its economic base, continue to grow at an increasing rate, and property values to increase in tune with the city growth.

6.  Pharr's International Bridge along with implementation of NAFTA should enhance growth in virtually all aspects of its economy.

## CITY OF PHARR MAP



SUBMARKET ANALYSIS

According to the Appraisal Institute, *The Dictionary of Real Estate Appraisal*, Fifth Edition, a submarket is a division of a total market that reflects the preferences of a particular set of buyers and sellers. According to definition, the submarket is considered to be the land along both sides of US Business Highway 83, bound by Cage Boulevard on the west and Veteran's Boulevard ("I" Road) on the east.

US Business Highway 83 is a secondary highway running through the business districts of many of the main cities in Hidalgo County. Cage Boulevard (US Highway 281) is the main north/south commercial traffic artery running through the center of the City of Pharr. Veterans Boulevard (I Road) is a north/south traffic artery. Access to and through the submarket is good due to a network of paved feeder streets.

The submarket is located in the eastern sector of the City of Pharr and is characterized as mixed commercial and industrial development, backed by established residential development in the western sector.

Commercial facilities are typically owner occupied. Vacancies appear low, even during the economic downturn in 2009, demonstrating excellent population support for commercial interests in the area.

Property values have remained stable throughout the past few years and supply/demand appears to be in balance with a marketing time of approximately 12-24 months depending on type of property and size. Current market indicators are for steady improved activity for the remainder of 2014. Public transportation is limited. Employment opportunities, schools, and recreational facilities are readily available throughout the submarket. There are no apparent adverse factors affecting marketability.

Indicators are for continued improved activity through 2014 and with continued population growth, development in the area should be steady in the years to come. The submarket appears economically stable at present.

SUBMARKET MAP



NOTE: Dated Image. Not taken at time of inspection.

SITE ANALYSIS

Not Applicable.  At the client's request, the land component has not been included in the appraisers' retrospective value opinion.

DESCRIPTION OF IMPROVEMENTS

General Description

*The subject property consists of a detached building only.  At the request of the client, the land component is not included in the retrospective value opinion.*

The subject building is commonly referred to as the Stambaugh Building.  This building contains a total gross building area of approximately 10,692 square feet.  According to the information available, the building was constructed in the early 1980's.  Construction is of concrete block perimeter walls with brick veneer on a grade-level concrete slab foundation with built-up roof cover over metal panels over steel frame.   The interior of the building as of the effective date was partitioned for use as classrooms and restrooms.

The appraisers estimate the subject's effective age to be 30 years with a total economic life of approximately 40 years.

Specific Construction Description:

Foundation:  Reinforced, grade-level concrete slab and beam system

Exterior Walls:  CMU perimeter walls faced with brick veneer, minimal commercial grade windows, commercial grade doors, gutters and downspouts.

Roof Structure:  Built-up roof cover over pre-engineered metal panels over steel frame

Flooring:  VCT flooring throughout

Interior Walls:  Painted/textured drywall, wood doors, metal door jambs, vinyl base board trim

Ceiling: Suspended tile with florescent lighting throughout

HVAC:  Electric HVAC throughout

Electrical:  Adequate service, wiring, outlets, and fixtures

Plumbing:  Adequate service, supply, and average quality fixtures

*Property Inspection Disclaimer:  The appraiser is not a licensed property inspector.  The Appraiser has inspected as far as possible, by observation, the land and the improvements; however, it was not possible to personally observe conditions beneath the soil or hidden structural, or other components.  We have not critically inspected mechanical components within the improvements and no representations are made herein as to these matters unless specifically stated and considered in the report.*

DESCRIPTION OF IMPROVEMENTS (continued)

Comments Regarding Condition of Improvements and Environmental Concerns

The appraisers have been informed that as of the effective date of the retrospective value opinion the subject building had known asbestos containing materials (ACM) in the floor tile, as well as certain hidden physical deficiencies that were not known as of the effective date of the retrospective value opinion, but were discovered shortly thereafter.

With respect to the asbestos containing materials, it is understood by the appraisers that the asbestos containing floor tiles were in good condition and not considered friable.   However, removal of or altering the ACM would have required abatement and remediation by qualified professionals.     The appraisers have been provided an estimated cost for abatement of $15,000.00.

With respect to the hidden physical deficiencies, conditions known after the effective date are considered relevant to the appraisal assignment.  Data known subsequent to the effective date may be considered in developing a retrospective value in such instances where it is reasonable that the data would be reasonably considered by a buyer or seller as of that date.[3]

To this end, it is considered reasonable that a typical buyer would have conducted due diligence in the evaluation of the subject improvements to determine any physical deficiencies.  This due diligence would likely have included exploration into the structural components of the subject buildings and a adequately conducted investigation would have revealed the physical deficiencies that existed at the time.  These physical deficiencies include the following:  no brick ties between the brick veneer and the CMU perimeter walls, no water proofing on perimeter walls, and no insulation on perimeter walls.

An estimated cost to demolish and make necessary repairs was provided to the appraisers and is included herein on the pages that follow.  The costs are for two adjacent buildings (the subject Stambaugh Building and the Textbook Building).  Separating costs for the subject building only indicates a cost of $268,493.00.

[3] The Uniform Standards of Professional Appraisal Practice, The Appraisal Standards Board of The Appraisal Foundation, Effective January 1, 2014 through December 31, 2015, Statement 3: Retrospective Value Opinions.

## DESCRIPTION OF IMPROVEMENTS (continued)

### Building Breakdown of Cost to Repair Physical Deficiencies:

| Work Segment | | Stambaugh | Textbook |
|---|---|---|---|
| saw cut | | $10,140 | $12,480 |
| demolition | | $28,000 | $16,800 |
| demo pick up | | $28,000 | $16,800 |
| rental | | $4,554 | $5,566 |
| debris loads | | $16,819 | $20,556 |
| asphalt repair | | $1,125 | $1,375 |
| | | | |
| wood blocking | | $3,025 | $9,318 |
| wood blocking | | $757 | $1,829 |
| roof fix | | $3,200 | $4,560 |
| | | | |
| metal studs | | $8,874 | $17,980 |
| | | $1,333 | $2,667 |
| | | $4,553 | $9,107 |
| | | $3,036 | $6,071 |
| | | $2,881 | $6,130 |
| | | $558 | $1,117 |
| | | $3,914 | $8,009 |
| | | $2,476 | $5,340 |
| | | | |
| tape,float,texture,paint | | $2,800 | $3,990 |
| electrical | | $4,950 | $4,950 |
| | | | |
| brick | | $10,770 | $12,797 |
| | | $14,144 | $16,806 |
| | | $2,461 | $2,925 |
| | | $1,624 | $1,929 |
| | | $320 | $380 |
| | | $3,396 | $4,034 |
| | | $1,325 | $1,575 |
| | | $971 | $1,154 |
| | | $5,399 | $6,414 |
| dampproofing | | $16,800 | $22,980 |
| | | $22,400 | $30,640 |
| flashing | | $2,400 | $3,420 |
| | | $1,600 | $2,280 |
| | | $2,400 | $3,420 |
| | | $1,600 | $2,280 |
| | | $1,200 | $1,140 |
| | | $800 | $760 |
| Plaster | | $28,000 | $38,300 |
| | | | |
| COST | | $248,605 | $307,879 |
| INSURANCE | 1% | $2,486 | $3,079 |
| BOND | 1% | $2,486 | $3,079 |
| OVERHEAD | 1% | $2,486 | $3,079 |
| PROFIT | 5% | $12,430 | $15,394 |
| TOTAL COST | | $268,493 | $332,510 |

Aguirre & Patterson, Inc.
Appraisal Report of the Stambaugh Building

## DESCRIPTION OF IMPROVEMENTS (continued)

**Builder's Cost Estimate:**

TEXAS DESCON, L.P.    JOB NAME:  THOMAS JEFFERSON EARLY COLLEGE H.S.        DATE:  7/20/

| | | | |
|---|---|---|---|
| 1 Demolition | | $ | 162,215 |
| 2 Wood Blocking | | $ | 22,688 |
| 3 Metal Studs, Gyp. Bd. & Dense Glass | | $ | 84,046 |
| 4 Painting | | $ | 16,690 |
| 5 Finish | | $ | 270,844 |
| 6 Option for Metal Panels | $  145,860.00 | | |
| | | $ | 556,484 |
| Insurance | 1% | $ | 5,565 |
| Bond | 1% | $ | 5,565 |
| Overhead | 1% | $ | 5,565 |
| Profit | 5% | $ | 27,824 |
| | | $ | 601,003 |

Aguirre & Patterson, Inc.
Appraisal Report of the Stambaugh Building

DESCRIPTION OF IMPROVEMENTS (continued)

| DESCRIPTION | QUANTITY | UNIT | UNIT COST L | UNIT COST M | UNIT COST S | LABOR | MATERIAL | SUB |
|---|---|---|---|---|---|---|---|---|
| **TEXAS DESCON L.P.** McALLEN TEXAS | | | PROJECT : | | THOMAS JEFFERSON EARLY COLLEGE | | | |
| **DEMOLITION OF STAMBAUGH & TEXTBOOK BUILDINGS** | | | | | | | | |
| Stambaugh Bldg = 400 lf x 14' high = 5600 Wall sf | | | | | | | | |
| Textbook Bldg = 570 lf x 13'-4" high = 7860 Wall sf | | | | | | | | |
| | | | | | | | | |
| **Saw Cut existing Masonry Walls for Demolition** | | | | | | | | |
| 13' High x 26 locations = 338 lf x 10" Deep | 3380 | Lf | | | 3 | | | 10,140 |
| 13' High x 32 locations = 416 lf x 10" Deep | 4160 | Lf | | | 3 | | | 12,480 |
| | | | | | | | | |
| **Demolition** | | | | | | | | |
| Stambaugh Bldg | | | | | | | | |
| 14M x 10H x 10D = 1400 Hours | 1400 | Hr | 20 | | | 28,000 | | |
| | | | | | | | | |
| Textbook Bldg | | | | | | | | |
| 14M x 10H x 6D = 840 Hours | 840 | Hr | 20 | | | 16,800 | | |
| | | | | | | | | |
| **Demolition Debris Pick up** | | | | | | | | |
| Stambaugh Bldg | | | | | | | | |
| 14M x 10H x 10D = 1400 Hours | 1400 | Hr | 20 | | | 28,000 | | |
| | | | | | | | | |
| Textbook Bldg | | | | | | | | |
| 14M x 10H x 6D = 840 Hours | 840 | Hr | 20 | | | 16,800 | | |
| | | | | | | | | |
| **Equipment Rental** | | | | | | | | |
| Back Hoe w/ Hammer Attachment & Bucket | 1 | Mo | | 2200 | | | | 2,200 |
| Skid steer w/ Bucket | 1 | Mo | | 3920 | | | | 3,920 |
| Operator 2M x 10H x 10D = 200 Hours | 200 | Hr | 20 | | | 4,000 | | |
| | | | | | | | | |
| **Trash Containers** | | | | | | | | |
| Debris Loads | 65 | Lds | | | 575 | | | 37,375 |
| | | | | | | | | |
| **Asphalt Repairs @ East side Drive** | | | | | | | | |
| Asphalt Repair Allowance | 1 | Ls | | 2500 | | | | 2,500 |
| | | | | | | | | |
| **TOTAL** | | | | | | 93,600 | | 68,615 |
| | | | | | | | | 162,215 |

Sheet No. 1                    Item:          DEMOLITION

## DESCRIPTION OF IMPROVEMENTS (continued)

**TEXAS DESCON L.P.**
McALLEN TEXAS

PROJECT :  THOMAS JEFFERSON EARLY COLLEGE

| DESCRIPTION | QUANTITY | UNIT | UNIT COST M | UNIT COST S | LABOR | MATERIAL | SUB |
|---|---|---|---|---|---|---|---|
| **Wood Blocking @ Parapets / Edge of Bldg** | | | | | | | |
| Stambaugh Bldg = 400 lf x 14' high | | | | | | | |
| 2- 2 x 8 x 520 lf = 1040 x 5% = | 1100 | lf | 1.5 | 1.25 | 1,650 | 1,375 | |
| | | | | | | | |
| Textbook Bldg = 570 lf x 13'-4" high | | | | | | | |
| 2- 2 x 6 x 940 lf = 1980 x 5% = | 2000 | lf | 1.5 | 1 | 3,000 | 2,000 | |
| 2- 2 x 8 x 743 lf = 1486 x 5% = | 1870 | lf | 1.5 | 1.25 | 2,355 | 1,963 | |
| | | | | | | | |
| **Wood Blocking @ Exterior Walls** | | | | | | | |
| Stambaugh Bldg | | | | | | | |
| 2- 2 x 8 x 130 lf = 260 x 5% = | 275 | lf | 1.5 | 1.25 | 413 | 344 | |
| | | | | | | | |
| Textbook Bldg | | | | | | | |
| 2- 2 x 8 x 630 lf = 630 x 5% = | 665 | lf | 1.5 | 1.25 | 998 | 831 | |
| | | | | | | | |
| **Roofing fix Perimeters** | | | | | | | |
| Stambaugh Bldg = 400 lf @ Perimeter | 400 | lf | 3 | 5 | 1,200 | 2,000 | |
| Textbook Bldg = 570 lf @ Perimeter | 570 | lf | 3 | 5 | 1,710 | 2,850 | |
| | | | | | | | |
| **TOTAL** | | | | | 11,326 | 11,363 | |
| | | | | | | | 22,688 |

Sheet No. 2    Item:  WOOD BLOCKING

DESCRIPTION OF IMPROVEMENTS (continued)

**TEXAS DESCON L.P.**
**McALLEN TEXAS**

PROJECT: THOMAS JEFFERSON EARLY COLLEGE

| DESCRIPTION | QUANTITY | UNIT | UNIT COST L | UNIT COST M | UNIT COST S | LABOR | MATERIAL | SUB |
|---|---|---|---|---|---|---|---|---|
| Metal Studs, Dense Glass & Gyp Bd ( Work in 4 Weeks ) | | | | | | | | |
| Stambaugh Building | | | | | | | | |
| Material | | | | | | | | |
| 6" 16 Ga. Metal Studs @ Perimeter Walls | 1 | | | 8873.99 | | | | 8,874 |
| R-19 Batt Insulation | 1 | | | 1333.41 | | | | 1,333 |
| Type X 5/8" Hi-Impact Gyp Bd | 1 | | | 4553.46 | | | | 4,553 |
| 1/2" Dense Glass Gold Sheathing | 1 | | | 3035.64 | | | | 3,036 |
| Labor | | | | | | | | |
| 6" 16 Ga. Metal Studs @ Perimeter Walls | 1 | | | 2881.39 | | | | 2,881 |
| R-19 Batt Insulation | 1 | | | 558.43 | | | | 558 |
| Type X 5/8" Hi-Impact Gyp Bd | 1 | | | 3914.17 | | | | 3,914 |
| 1/2" Dense Glass Gold Sheathing | 1 | | | 2476.1 | | | | 2,476 |
| Textbook Building | | | | | | | | |
| Material | | | | | | | | |
| 6" 16 Ga. Metal Studs @ Perimeter Walls | 1 | | | 17980.4 | | | | 17,980 |
| R-19 Batt Insulation | 1 | | | 2666.83 | | | | 2,667 |
| Type X 5/8" Hi-Impact Gyp Bd | 1 | | | 9106.91 | | | | 9,107 |
| 1/2" Dense Glass Gold Sheathing | 1 | | | 6071.20 | | | | 6,071 |
| Labor | | | | | | | | |
| 6" 16 Ga. Metal Studs @ Perimeter Walls | 1 | | | 6130.16 | | | | 6,130 |
| R-19 Batt Insulation | 1 | | | 1116.86 | | | | 1,117 |
| Type X 5/8" Hi-Impact Gyp Bd | 1 | | | 8009.32 | | | | 8,009 |
| 1/2" Dense Glass Gold Sheathing | 1 | | | 5339.54 | | | | 5,340 |
| | | | | | | | | 84,048 |
| **TOTAL** | | | | | | | | 84,048 |

Sheet No. 3       Item: METAL STUDS, GYP. BD & DENSE GLASS

Aguirre & Patterson, Inc.
Appraisal Report of the Stambaugh Building

## DESCRIPTION OF IMPROVEMENTS (continued)

| TEXAS DESCON L.P. McALLEN TEXAS | | | PROJECT : | | | THOMAS JEFFERSON EARLY COLLEGE | | |
|---|---|---|---|---|---|---|---|---|
| DESCRIPTION | QUANTITY | UNIT | **UNIT COST** | | | LABOR | MATERIAL | SUB |
| | | | L | M | S | | | |
| Painter - Tapa, Float & Texture Walls VS CMU Paint | | | | | | | | |
| **Stambaugh Building** | | | | | | | | |
| Credit for CMU Painting, - 400 lf x 10' = 4000 | 4000 | sf | -0.4 | -0.4 | | (1,600) | (1,600) | |
| Add for T,F,T & P, - 400 lf x 10' = 4000 | 4000 | sf | 0.75 | 0.75 | | 3,000 | 3,000 | |
| **Textbook Building** | | | | | | | | |
| Credit for CMU Painting, - 570 lf x 10' = 5700 | 5700 | sf | -0.4 | -0.4 | | (2,280) | (2,280) | |
| Add for T,F,T & P, - 570 lf x 10' = 5700 | 5700 | sf | 0.75 | 0.75 | | 4,275 | 4,275 | |
| | | | | | | | | |
| **Electrical** | | | | | | | | |
| Remove installed electrical conduit & Boxes | 1 | Ls | | | 4950 | | | 4,950 |
| Reinstall Electrical conduit & Boxes | 1 | Ls | | | 4950 | | | 4,950 |
| | | | | | | | | |
| | | | | | | 3,395 | 3,395 | 9,000 |
| **TOTAL** | | | | | | | | 15,690 |

Sheet No.   4      Item:      PAINTING

Aguirre & Patterson, Inc.
Appraisal Report of the Stambaugh Building

## DESCRIPTION OF IMPROVEMENTS (continued)

**TEXAS DESCON L.P.**
**McALLEN TEXAS**

PROJECT: **THOMAS JEFFERSON EARLY COLLEGE**

| DESCRIPTION | QUANTITY | UNIT | UNIT COST L | UNIT COST M | UNIT COST B | LABOR | MATERIAL | SUB |
|---|---|---|---|---|---|---|---|---|
| Brick | | | | | | | | |
| Stambaugh Bldg = 21,518 Bricks | | | | | | | | |
| Textbook Bldg = 25,522 Bricks | 1 | | | | 23567 | | | 23,567 |
| Brick Labor | 1 | | | | 30950.2 | | | 30,950 |
| Brick Anchors | 1 | | | | 5385.8 | | | 5,386 |
| Mortar Net | 1 | | | | 3553 | | | 3,553 |
| Screws | 1 | | | | 700 | | | 700 |
| Mortar | 1 | | | | 7429.96 | | | 7,430 |
| Sand | 1 | | | | 2900.32 | | | 2,900 |
| Rentals | 1 | | | | 2125 | | | 2,125 |
| Overhead Profit | 1 | | | | 11812.5 | | | 11,813 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Dampproofing | | | | | | | | |
| Stambaugh Bldg = 400 lf x 14' high = 5600 sf | 5600 | sf | 3 | 4 | | 16,800 | 22,400 | |
| Textbook Bldg = 570 lf x 13'-4" high = 7660 sf | 7660 | sf | 3 | 4 | | 22,980 | 30,640 | |
| | | | | | | | | |
| | | | | | | | | |
| Flashing - Base, Roof & Door & Window Coping | | | | | | | | |
| Stambaugh Bldg | | | | | | | | |
| Base 400 lf x 2 T & B | 800 | lf | 3 | 2 | | 2,400 | 1,600 | |
| Roof 400 lf x 2 T & B | 800 | lf | 3 | 2 | | 2,400 | 1,600 | |
| Doors / Windows 200 lf x 2 T & B | 400 | lf | 3 | 2 | | 1,200 | 800 | |
| | | | | | | | | |
| Textbook Bldg | | | | | | | | |
| Base 570 lf x 2 T & B | 1140 | lf | 3 | 2 | | 3,420 | 2,280 | |
| Roof 570 lf x 2 T & B | 1140 | lf | 3 | 2 | | 3,420 | 2,280 | |
| Doors & Windows 190 lf x 2 T & B | 380 | lf | 3 | 2 | | 1,140 | 760 | |
| | | | | | | | | |
| | | | | | | | | |
| 3/4" Plaster | | | | | | | | |
| Stambaugh Bldg = 400 lf x 14' high = 5600 sf | 5600 | sf | | | 5 | | | 28,000 |
| Textbook Bldg = 570 lf x 13'-4" high = 7660 sf | 7660 | sf | | | 5 | | | 38,300 |
| | | | | | | | | |
| | | | | | | | | |
| **TOTAL** | | | | | | 53,780 | 62,360 | 154,724 |
| | | | | | | | | 270,844 |

Sheet No. 6   Item: FINISH