C-5149-14-H

3. Owner shall pay the required fees for review of the Construction Documents by the Texas Department of Licensing and Regulations for compliance with the Texas Accessibility Stands (T.A.S.)

4. In the event that the State of Texas legislates a sales tax on Professional Services, the amount of the tax applicable to the Project will be added to Architect's invoices.

5. The Texas Board of Architectural Examiners, 333 Guadalupe, Suite 2350, Austin, Texas 78701-3942, Tel. (512) 303-9000, has jurisdiction over individuals licensed under the Architects Registration Law, Article 249a, Vernon's Civil Statues.

6. Should the Owner or Client request changes to the SCOPE OF SERVICES or if additional services are requested, all incurred costs shall be billed on a time and materials basis in accordance with an approved rate schedule. An estimate of additional costs will be provided at an additional cost, if not provided by the Owner.

7. Basic design services do not include survey for, or remediation design of, hazardous material in existing buildings or on the project site. These services can be provided at an additional cost, if not provided by the Owner.

8. Basic design services do not include the design for extension of off-site utilities to the project site, or the provision of service upgrades or improvements outside of the immediate project area on the campus. These services, if required, can be provided as an additional service.

9. Basic design services do not include historical restoration work which may be required by the Texas Historical Commission. Based on the initial investigation performed by Mr. Rene Campos, the old High School building has a designation as a Historical Marker and not that of a Historical Landmark. These services, if required, can be provided as an additional service.

...

Project Planning Stage Basic Services:
Campus Master Planning                                        $15,000.00
Facility Programming (including estimate) for Phase I $12,000.00
6% times the cost of work for new construction.
7.75% times the cost of work for adaptive renovation work.

...

Hourly Rate Schedule:

| | |
|---|---|
| 1. Principals | $160.00 |
| 2. Architects and Engineers other than Principals: | $140.00 |
| 3. CADD-Computer Aided Design &Drafting: | $120.00 |
| 4. Interns and Designers | $ 85.00 |

§ 1.5.3 For a Change in Services of the Architect's consultants, compensation shall be computed as a multiple of One and one-tenth ( 1.10 ) times the amounts billed to the Architect for such services.

§ 1.5.4 For Reimbursable Expenses as described in Section 1.3.9.2, and any other items included in Section 1.5.5 as Reimbursable Expenses, the compensation shall be computed as a multiple of One and one-tenth ( 1.10 ) times the expenses incurred by the Architect, and the Architect's employees and consultants.

PAGE 10

§ 1.5.7 An initial payment of Zero Dollars and Zero Cents ($ 0.00 ) shall be made upon execution of this Agreement and is the minimum payment under this Agreement. It shall be credited to the Owner's account at final payment. Subsequent payments for services shall be made monthly, and where applicable, shall be in proportion to services performed on the basis set forth in this Agreement.

§ 1.5.8 Payments are due and payable Thirty ( 30 ) days from the date of the Architect's invoice. Amounts unpaid Thirty ( 30 ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect.

...

Additions and Deletions Report for AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:40:33 on 12/18/2008 under Order No.1000370781_1 which expires on 9/10/2009, and is not for resale.
User Notes:                                                                                                    (9420260384)

4

C-5149-14-H

Legal prevailing rate in Hidalgo County, Texas

...

§ 1.5.9 If the services covered by this Agreement have not been completed within Thirty-six ( 36 ) months of
the date hereof, through no fault of the Architect, extension of the Architect's services beyond that time shall be
compensated as provided in Section 1.5.2.

...

Dr. Daniel P. King, Superintendent of Schools          Eli R. Ochoa, P.E., AIA

Additions and Deletions Report for AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1959, 1958, 1961, 1963, 1966, 1967, 1970,
1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright
Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and
criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:40:33 on
12/18/2008 under Order No.1000370781_1 which expires on 9/10/2009, and is not for resale.
User Notes:                                                                                                              (3426260884)

C-5149-14-H

## Certification of Document's Authenticity
### AIA® Document D401™ – 2003

I, Eli R. Ochoa, P.E., AIA, hereby certify, to the best of my knowledge, information and belief, that I created the attached final document simultaneously with its associated Additions and Deletions Report and this certification at 13:40:33 on 12/18/2008 under Order No. 1000370781_1 from AIA Contract Documents software and that in preparing the attached final document I made no changes to the original text of AIA® Document B141™ – 1997 Part 1 - Standard Form of Agreement Between Owner and Architect with Standard Form of Architect's Services, as published by the AIA in its software, other than those additions and deletions shown in the associated Additions and Deletions Report.

_____
(Signed)

P.E., AIA Partner
_____
(Title)

12-18-08
_____
(Dated)

AIA Document D401™ – 2003. Copyright © 1992 and 2003 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:40:33 on 12/18/2008 under Order No.1000370781_1 which expires on 9/10/2009, and is not for resale.
User Notes: (3426260384)

1

# ▓AIA® Document B141™ – 1997 Part 2

C-5149-14-H

**Standard Form of Architect's Services:** Design and Contract Administration

## TABLE OF ARTICLES

2.1     PROJECT ADMINISTRATION SERVICES

2.2     SUPPORTING SERVICES

2.3     EVALUATION AND PLANNING SERVICES

2.4     DESIGN SERVICES

2.5     CONSTRUCTION PROCUREMENT SERVICES

2.6     CONTRACT ADMINISTRATION SERVICES

2.7     FACILITY OPERATION SERVICES

2.8     SCHEDULE OF SERVICES

2.9     MODIFICATIONS

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

## ARTICLE 2.1  PROJECT ADMINISTRATION SERVICES

§ 2.1.1 The Architect shall manage the Architect's services and administer the Project. The Architect shall consult with the Owner, research applicable design criteria, attend Project meetings, communicate with members of the Project team and issue progress reports. The Architect shall coordinate the services provided by the Architect and the Architect's consultants with those services provided by the Owner and the Owner's consultants.

§ 2.1.2 When Project requirements have been sufficiently identified, the Architect shall prepare, and periodically update, a Project schedule that shall identify milestone dates for decisions required of the Owner, design services furnished by the Architect, completion of documentation provided by the Architect, commencement of construction and Substantial Completion of the Work.

§ 2.1.3 The Architect shall consider the value of alternative materials, building systems and equipment, together with other considerations based on program, budget and aesthetics in developing the design for the Project.

§ 2.1.4 Upon request of the Owner, the Architect shall make a presentation to explain the design of the Project to representatives of the Owner.

§ 2.1.5 The Architect shall submit design documents to the Owner at intervals appropriate to the design process for purposes of evaluation and approval by the Owner. The Architect shall be entitled to rely on approvals received from the Owner in the further development of the design.

§ 2.1.6 The Architect shall assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the Project.



**Init.**

**/**

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:00:11 on 12/17/2008 under Order No.1000370781_1 which expires on 9/10/2009, and is not for resale.
User Notes:                                                                                                  (3034884380)

C-5149-14-H

## § 2.1.7 EVALUATION OF BUDGET AND COST OF THE WORK

§ 2.1.7.1 When the Project requirements have been sufficiently identified, the Architect shall prepare a preliminary estimate of the Cost of the Work. This estimate may be based on current area, volume or similar conceptual estimating techniques. As the design process progresses through the end of the preparation of the Construction Documents, the Architect shall update and refine the preliminary estimate of the Cost of the Work. The Architect shall advise the Owner of any adjustments to previous estimates of the Cost of the Work indicated by changes in Project requirements or general market conditions. If at any time the Architect's estimate of the Cost of the Work exceeds the Owner's budget, the Architect shall make appropriate recommendations to the Owner to adjust the Project's size, quality or budget, and the Owner shall cooperate with the Architect in making such adjustments.

§ 2.1.7.2 Evaluations of the Owner's budget for the Project, the preliminary estimate of the Cost of the Work and updated estimates of the Cost of the Work prepared by the Architect represent the Architect's judgment as a design professional familiar with the construction industry. It is recognized, however, that neither the Architect nor the Owner has control over the cost of labor, materials or equipment, over the Contractor's methods of determining bid prices, or over competitive bidding, market or negotiating conditions. Accordingly, the Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from the Owner's budget for the Project or from any estimate of the Cost of the Work or evaluation prepared or agreed to by the Architect.

§ 2.1.7.3 In preparing estimates of the Cost of the Work, the Architect shall be permitted to include contingencies for design, bidding and price escalation; to determine what materials, equipment, component systems and types of construction are to be included in the Contract Documents; to make reasonable adjustments in the scope of the Project and to include in the Contract Documents alternate bids as may be necessary to adjust the estimated Cost of the Work to meet the Owner's budget for the Cost of the Work. If an increase in the Contract Sum occurring after execution of the Contract between the Owner and the Contractor causes the budget for the Cost of the Work to be exceeded, that budget shall be increased accordingly.

§ 2.1.7.4 If bidding or negotiation has not commenced within 90 days after the Architect submits the Construction Documents to the Owner, the budget for the Cost of the Work shall be adjusted to reflect changes in the general level of prices in the construction industry.

§ 2.1.7.5 If the budget for the Cost of the Work is exceeded by the lowest bona fide bid or negotiated proposal, the Owner shall:

    .1    give written approval of an increase in the budget for the Cost of the Work;
    .2    authorize rebidding or renegotiating of the Project within a reasonable time;
    .3    terminate in accordance with Section 1.3.8.5; or
    .4    cooperate in revising the Project scope and quality as required to reduce the Cost of the Work.

§ 2.1.7.6 If the Owner chooses to proceed under Section 2.1.7.5.4, the Architect, without additional compensation, shall modify the documents for which the Architect is responsible under this Agreement as necessary to comply with the budget for the Cost of the Work. The modification of such documents shall be the limit of the Architect's responsibility under this Section 2.1.7. The Architect shall be entitled to compensation in accordance with this Agreement for all services performed whether or not construction is commenced.

## ARTICLE 2.2 SUPPORTING SERVICES

§ 2.2.1 Unless specifically designated in Section 2.8.3, the services in this Article 2.2 shall be provided by the Owner or the Owner's consultants and contractors.

§ 2.2.1.1 The Owner shall furnish a program setting forth the Owner's objectives, schedule, constraints and criteria, including space requirements and relationships, special equipment, systems and site requirements.

§ 2.2.1.2 The Owner shall furnish surveys to describe physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site. The surveys and legal information shall include, as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site; locations, dimensions and necessary data with respect to existing buildings, other improvements and trees; and



Init.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:00:11 on 12/17/2008 under Order No.1000370781_1 which expires on 9/10/2009, and is not for resale.
User Notes:                                   (3084884380)

2

C-5149-14-H

information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All the information on the survey shall be referenced to a Project benchmark.

§ 2.2.1.3 The Owner shall furnish services of geotechnical engineers which may include but are not limited to test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, ground corrosion tests and resistivity tests, including necessary operations for anticipating subsoil conditions, with reports and appropriate recommendations.

## ARTICLE 2.3  EVALUATION AND PLANNING SERVICES
§ 2.3.1 The Architect shall provide a preliminary evaluation of the information furnished by the Owner under this Agreement, including the Owner's program and schedule requirements and budget for the Cost of the Work, each in terms of the other. The Architect shall review such information to ascertain that it is consistent with the requirements of the Project and shall notify the Owner of any other information or consultant services that may be reasonably needed for the Project.

§ 2.3.2 The Architect shall provide a preliminary evaluation of the Owner's site for the Project based on the information provided by the Owner of site conditions, and the Owner's program, schedule and budget for the Cost of the Work.

§ 2.3.3 The Architect shall review the Owner's proposed method of contracting for construction services and shall notify the Owner of anticipated impacts that such method may have on the Owner's program, financial and time requirements, and the scope of the Project.

## ARTICLE 2.4  DESIGN SERVICES
§ 2.4.1 The Architect's design services shall include normal structural, mechanical and electrical engineering services.

### § 2.4.2 SCHEMATIC DESIGN DOCUMENTS
§ 2.4.2.1 The Architect shall provide Schematic Design Documents based on the mutually agreed-upon program, schedule, and budget for the Cost of the Work. The documents shall establish the conceptual design of the Project illustrating the scale and relationship of the Project components. The Schematic Design Documents shall include a conceptual site plan, if appropriate, and preliminary building plans, sections and elevations. At the Architect's option, the Schematic Design Documents may include study models, perspective sketches, electronic modeling or combinations of these media. Preliminary selections of major building systems and construction materials shall be noted on the drawings or described in writing.

### § 2.4.3 DESIGN DEVELOPMENT DOCUMENTS
§ 2.4.3.1 The Architect shall provide Design Development Documents based on the approved Schematic Design Documents and updated budget for the Cost of the Work. The Design Development Documents shall illustrate and describe the refinement of the design of the Project, establishing the scope, relationships, forms, size and appearance of the Project by means of plans, sections and elevations, typical construction details, and equipment layouts. The Design Development Documents shall include specifications that identify major materials and systems and establish in general their quality levels.

### § 2.4.4 CONSTRUCTION DOCUMENTS
§ 2.4.4.1 The Architect shall provide Construction Documents based on the approved Design Development Documents and updated budget for the Cost of the Work. The Construction Documents shall set forth in detail the requirements for construction of the Project. The Construction Documents shall include Drawings and Specifications that establish in detail the quality levels of materials and systems required for the Project.

§ 2.4.4.2 During the development of the Construction Documents, the Architect shall assist the Owner in the development and preparation of: (1) bidding and procurement information which describes the time, place and conditions of bidding; bidding or proposal forms; and the form of agreement between the Owner and the Contractor; and (2) the Conditions of the Contract for Construction (General, Supplementary and other Conditions). The Architect also shall compile the Project Manual that includes the Conditions of the Contract for Construction and Specifications and may include bidding requirements and sample forms.

Init.

/

AIA Document B141™ – 1997 Part 2: Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:00:11 on 12/17/2008 under Order No.1000370781_1 which expires on 9/10/2009, and is not for resale.
User Notes:



3

(3034884980)

C-5149-14-H

## ARTICLE 2.5  CONSTRUCTION PROCUREMENT SERVICES
§ 2.5.1 The Architect shall assist the Owner in obtaining either competitive bids or negotiated proposals and shall assist the Owner in awarding and preparing contracts for construction.

§ 2.5.2 The Architect shall assist the Owner in establishing a list of prospective bidders or contractors.

§ 2.5.3 The Architect shall assist the Owner in bid validation or proposal evaluation and determination of the successful bid or proposal, if any. If requested by the Owner, the Architect shall notify all prospective bidders or contractors of the bid or proposal results.

### § 2.5.4 COMPETITIVE BIDDING
§ 2.5.4.1 Bidding Documents shall consist of bidding requirements, proposed contract forms, General Conditions and Supplementary Conditions, Specifications and Drawings.

§ 2.5.4.2 If requested by the Owner, the Architect shall arrange for procuring the reproduction of Bidding Documents for distribution to prospective bidders. The Owner shall pay directly for the cost of reproduction or shall reimburse the Architect for such expenses.

§ 2.5.4.3 If requested by the Owner, the Architect shall distribute the Bidding Documents to prospective bidders and request their return upon completion of the bidding process. The Architect shall maintain a log of distribution and retrieval, and the amounts of deposits, if any, received from and returned to prospective bidders.

§ 2.5.4.4 The Architect shall consider requests for substitutions, if permitted by the Bidding Documents, and shall prepare and distribute addenda identifying approved substitutions to all prospective bidders.

§ 2.5.4.5 The Architect shall participate in or, at the Owner's direction, shall organize and conduct a pre-bid conference for prospective bidders.

§ 2.5.4.6 The Architect shall prepare responses to questions from prospective bidders and provide clarifications and interpretations of the Bidding Documents to all prospective bidders in the form of addenda.

§ 2.5.4.7 The Architect shall participate in or, at the Owner's direction, shall organize and conduct the opening of the bids. The Architect shall subsequently document and distribute the bidding results, as directed by the Owner.

### § 2.5.5 NEGOTIATED PROPOSALS
§ 2.5.5.1 Proposal Documents shall consist of proposal requirements, proposed contract forms, General Conditions and Supplementary Conditions, Specifications and Drawings.

§ 2.5.5.2 If requested by the Owner, the Architect shall arrange for procuring the reproduction of Proposal Documents for distribution to prospective contractors. The Owner shall pay directly for the cost of reproduction or shall reimburse the Architect for such expenses.

§ 2.5.5.3 If requested by the Owner, the Architect shall organize and participate in selection interviews with prospective contractors.

§ 2.5.5.4 The Architect shall consider requests for substitutions, if permitted by the Proposal Documents, and shall prepare and distribute addenda identifying approved substitutions to all prospective contractors.

§ 2.5.5.5 If requested by the Owner, the Architect shall assist the Owner during negotiations with prospective contractors. The Architect shall subsequently prepare a summary report of the negotiation results, as directed by the Owner.

## ARTICLE 2.6  CONTRACT ADMINISTRATION SERVICES
### § 2.6.1 GENERAL ADMINISTRATION
§ 2.6.1.1 The Architect shall provide administration of the Contract between the Owner and the Contractor as set forth below and in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement. Modifications made to the General Conditions, when adopted as part of the



AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:00:11 on 12/17/2008 under Order No.1000370781_1 which expires on 9/10/2009, and is not for resale.
User Notes:                                                                                      (3084884580)

**4**

C-5149-14-H

Contract Documents, shall be enforceable under this Agreement only to the extent that they are consistent with this Agreement or approved in writing by the Architect.

§ 2.6.1.2 The Architect's responsibility to provide the Contract Administration Services under this Agreement commences with the award of the initial Contract for Construction and terminates at the issuance to the Owner of the final Certificate for Payment. However, the Architect shall be entitled to a Change in Services in accordance with Section 2.8.2 when Contract Administration Services extend 60 days after the date of Substantial Completion of the Work.

§ 2.6.1.3 The Architect shall be a representative of and shall advise and consult with the Owner during the provision of the Contract Administration Services. The Architect shall have authority to act on behalf of the Owner only to the extent provided in this Agreement unless otherwise modified by written amendment.

§ 2.6.1.4 Duties, responsibilities and limitations of authority of the Architect under this Article 2.6 shall not be restricted, modified or extended without written agreement of the Owner and Architect with consent of the Contractor, which consent will not be unreasonably withheld.

§ 2.6.1.5 The Architect shall review properly prepared, timely requests by the Contractor for additional information about the Contract Documents. A properly prepared request for additional information about the Contract Documents shall be in a form prepared or approved by the Architect and shall include a detailed written statement that indicates the specific Drawings or Specifications in need of clarification and the nature of the clarification requested.

§ 2.6.1.6 If deemed appropriate by the Architect, the Architect shall on the Owner's behalf prepare, reproduce and distribute supplemental Drawings and Specifications in response to requests for information by the Contractor.

§ 2.6.1.7 The Architect shall interpret and decide matters concerning performance of the Owner and Contractor under, and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests shall be made in writing within any time limits agreed upon or otherwise with reasonable promptness.

§ 2.6.1.8 Interpretations and decisions of the Architect shall be consistent with the intent of and reasonably inferable from the Contract Documents and shall be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect shall endeavor to secure faithful performance by both Owner and Contractor, shall not show partiality to either, and shall not be liable for the results of interpretations or decisions so rendered in good faith.

§ 2.6.1.9 The Architect shall render initial decisions on claims, disputes or other matters in question between the Owner and Contractor as provided in the Contract Documents. However, the Architect's decisions on matters relating to aesthetic effect shall be final if consistent with the intent expressed in the Contract Documents.

§ 2.6.2 EVALUATIONS OF THE WORK
§ 2.6.2.1 The Architect, as a representative of the Owner, shall visit the site at intervals appropriate to the stage of the Contractor's operations, or as otherwise agreed by the Owner and the Architect in Article 2.8, (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents.

§ 2.6.2.2 The Architect shall report to the Owner known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor. However, the Architect shall not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or

Init.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:00:11 on 12/17/2008 under Order No.1000970781_1 which expires on 9/10/2009, and is not for resale.
User Notes:                                                                                                                    (3034884980)

/

## C-5149-14-H

charge of and shall not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work.

**§ 2.6.2.3** The Architect shall at all times have access to the Work wherever it is in preparation or progress.

**§ 2.6.2.4** Except as otherwise provided in this Agreement or when direct communications have been specially authorized, the Owner shall endeavor to communicate with the Contractor through the Architect about matters arising out of or relating to the Contract Documents. Communications by and with the Architect's consultants shall be through the Architect.

**§ 2.6.2.5** The Architect shall have authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect will have authority to require inspection or testing of the Work in accordance with the provisions of the Contract Documents, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees or other persons or entities performing portions of the Work.

### § 2.6.3 CERTIFICATION OF PAYMENTS TO CONTRACTOR
**§ 2.6.3.1** The Architect shall review and certify the amounts due the Contractor and shall issue Certificates for Payment in such amounts. The Architect's certification for payment shall constitute a representation to the Owner, based on the Architect's evaluation of the Work as provided in Section 2.6.2 and on the data comprising the Contractor's Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject (1) to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, (2) to results of subsequent tests and inspections, (3) to correction of minor deviations from the Contract Documents prior to completion, and (4) to specific qualifications expressed by the Architect.

**§ 2.6.3.2** The issuance of a Certificate for Payment shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

**§ 2.6.3.3** The Architect shall maintain a record of the Contractor's Applications for Payment.

### § 2.6.4 SUBMITTALS
**§ 2.6.4.1** The Architect shall review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action shall be taken with such reasonable promptness as to cause no delay in the Work or in the activities of the Owner, Contractor or separate contractors, while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

**§ 2.6.4.2** The Architect shall maintain a record of submittals and copies of submittals supplied by the Contractor in accordance with the requirements of the Contract Documents.

**§ 2.6.4.3** If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Architect shall specify appropriate performance and design criteria that such services must satisfy. Shop Drawings and other submittals

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:00:11 on 12/17/2008 under Order No.1000870781_1 which expires on 9/10/2009, and is not for resale.
User Notes: (3034884380)

Init.

6

C-5149-14-H

related to the Work designed or certified by the design professional retained by the Contractor shall bear such professional's written approval when submitted to the Architect. The Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals.

### § 2.6.5 CHANGES IN THE WORK
**§ 2.6.5.1** The Architect shall prepare Change Orders and Construction Change Directives for the Owner's approval and execution in accordance with the Contract Documents. The Architect may authorize minor changes in the Work not involving an adjustment in Contract Sum or an extension of the Contract Time which are consistent with the intent of the Contract Documents. If necessary, the Architect shall prepare, reproduce and distribute Drawings and Specifications to describe Work to be added, deleted or modified, as provided in Section 2.8.2.

**§ 2.6.5.2** The Architect shall review properly prepared, timely requests by the Owner or Contractor for changes in the Work, including adjustments to the Contract Sum or Contract Time. A properly prepared request for a change in the Work shall be accompanied by sufficient supporting data and information to permit the Architect to make a reasonable determination without extensive investigation or preparation of additional drawings or specifications. If the Architect determines that requested changes in the Work are not materially different from the requirements of the Contract Documents, the Architect may issue an order for a minor change in the Work or recommend to the Owner that the requested change be denied.

**§ 2.6.5.3** If the Architect determines that implementation of the requested changes would result in a material change to the Contract that may cause an adjustment in the Contract Time or Contract Sum, the Architect shall make a recommendation to the Owner, who may authorize further investigation of such change. Upon such authorization, and based upon information furnished by the Contractor, if any, the Architect shall estimate the additional cost and time that might result from such change, including any additional costs attributable to a Change in Services of the Architect. With the Owner's approval, the Architect shall incorporate those estimates into a Change Order or other appropriate documentation for the Owner's execution or negotiation with the Contractor.

**§ 2.6.5.4** The Architect shall maintain records relative to changes in the Work.

### § 2.6.6 PROJECT COMPLETION
**§ 2.6.6.1** The Architect shall conduct inspections to determine the date or dates of Substantial Completion and the date of final completion, shall receive from the Contractor and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract Documents and assembled by the Contractor, and shall issue a final Certificate for Payment based upon a final inspection indicating the Work complies with the requirements of the Contract Documents.

**§ 2.6.6.2** The Architect's inspection shall be conducted with the Owner's Designated Representative to check conformance of the Work with the requirements of the Contract Documents and to verify the accuracy and completeness of the list submitted by the Contractor of Work to be completed or corrected.

**§ 2.6.6.3** When the Work is found to be substantially complete, the Architect shall inform the Owner about the balance of the Contract Sum remaining to be paid the Contractor, including any amounts needed to pay for final completion or correction of the Work.

**§ 2.6.6.4** The Architect shall receive from the Contractor and forward to the Owner: (1) consent of surety or sureties, if any, to reduction in or partial release of retainage or the making of final payment and (2) affidavits, receipts, releases and waivers of liens or bonds indemnifying the Owner against liens.

## ARTICLE 2.7  FACILITY OPERATION SERVICES
**§ 2.7.1** The Architect shall meet with the Owner or the Owner's Designated Representative promptly after Substantial Completion to review the need for facility operation services.

**§ 2.7.2** Upon request of the Owner, and prior to the expiration of one year from the date of Substantial Completion, the Architect shall conduct a meeting with the Owner and the Owner's Designated Representative to review the facility operations and performance and to make appropriate recommendations to the Owner.

Init.

/

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:00:11 on 12/17/2008 under Order No.1000370781_1 which expires on 9/10/2009, and is not for resale.
User Notes:                                                                                                          (3034664380)

C-5149-14-H

## ARTICLE 2.8  SCHEDULE OF SERVICES
§ 2.8.1 Design and Contract Administration Services beyond the following limits shall be provided by the Architect as a Change in Services in accordance with Section 1.3.3:

- .1 up to Two ( 2 ) reviews of each Shop Drawing, Product Data item, sample and similar submittal of the Contractor.
- .2 up to Two ( 2 ) visits to the site by the Architect over the duration of the Project during construction.
- .3 up to One ( 1 ) inspections for any portion of the Work to determine whether such portion of the Work is substantially complete in accordance with the requirements of the Contract Documents.
- .4 up to One ( 1 ) inspections for any portion of the Work to determine final completion.

§ 2.8.2 The following Design and Contract Administration Services shall be provided by the Architect as a Change in Services in accordance with Section 1.3.3:

- .1 review of a Contractor's submittal out of sequence from the submittal schedule agreed to by the Architect;
- .2 responses to the Contractor's requests for information where such information is available to the Contractor from a careful study and comparison of the Contract Documents, field conditions, other Owner-provided information, Contractor-prepared coordination drawings, or prior Project correspondence or documentation;
- .3 Change Orders and Construction Change Directives requiring evaluation of proposals, including the preparation or revision of Instruments of Service;
- .4 providing consultation concerning replacement of Work resulting from fire or other cause during construction;
- .5 evaluation of an extensive number of claims submitted by the Owner's consultants, the Contractor or others in connection with the Work;
- .6 evaluation of substitutions proposed by the Owner's consultants or contractors and making subsequent revisions to Instruments of Service resulting therefrom;
- .7 preparation of design and documentation for alternate bid or proposal requests proposed by the Owner; or
- .8 Contract Administration Services provided 60 days after the date of Substantial Completion of the Work.

§ 2.8.3 The Architect shall furnish or provide the following services only if specifically designated:

| Services | | Responsibility (Architect, Owner or Not Provided) | Location of Service Description |
|---|---|---|---|
| .1 | Programming | Architect / Owner | |
| .2 | Land Survey Services | Owner | |
| .3 | Geotechnical Services | Owner | |
| .4 | Space Schematics/Flow Diagrams | Not Provided | |
| .5 | Existing Facilities Surveys | Not Provided | |
| .6 | Economic Feasibility Studies | Not Provided | |
| .7 | Site Analysis and Selection | Not Provided | |
| .8 | Environmental Studies and Reports | Owner | |
| .9 | Owner-Supplied Data Coordination | Not Provided | |
| .10 | Schedule Development and Monitoring | Not Provided | |
| .11 | Civil Design | Off-Site: Owner | |
| .12 | Landscape Design | Not Provided | |
| .13 | Interior Design | Not Provided | |
| .14 | Special Bidding or Negotiation | Not Provided | |
| .15 | Value Analysis | Not Provided | |
| .16 | Detailed Cost Estimating | Not Provided | |
| .17 | On-Site Project Representation | Not Provided | |
| .18 | Construction Management | Not Provided | |

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:00:11 on 12/17/2008 under Order No.1000370781_1 which expires on 9/10/2009, and is not for resale.
User Notes: (3034884860)

Init.

8

C-5149-14-H

| | | | |
|---|---|---|---|
| .19 | Start-up Assistance | Not Provided | |
| .20 | Record Drawings | Not Provided | |
| .21 | Post-Contract Evaluation | Not Provided | |
| .22 | Tenant-Related Services | Not Provided | |
| .23 | **Structural Engineering** | Architect | |
| .24 | **MEP Engineering** | Architect | |
| .25 | **Civil Engineering (On-Site)** | Architect | |

Description of Services.
*(Insert descriptions of the services designated.)*

## ARTICLE 2.9  MODIFICATIONS
§ 2.9.1 Modifications to this Standard Form of Architect's Services: Design and Contract Administration, if any, are as follows:

By its execution, this Standard Form of Architect's Services: Design and Contract Administration and modifications hereto are incorporated into the Standard Form of Agreement Between the Owner and Architect, AIA Document B141-1997, that was entered into by the parties as of the date:

**OWNER**

_____
*(Signature)*
Dr. Daniel P. King, Superintendent of Schools
*(Printed name and title)*

**ARCHITECT**

_____
*(Signature)*
Eli R. Ochoa, P.E., AIA
*(Printed name and title)*

Init.

/

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:00:11 on 12/17/2008 under Order No.1000370781_1 which expires on 9/10/2009, and is not for resale.
User Notes:                                                                              (3054884980)

C-5149-14-H

## Additions and Deletions Report for
AIA® Document B141™ – 1997 Part 2

This Additions and Deletions Report, as defined on page 1 of the associated document, reproduces below all text the author has added to the standard form AIA document in order to complete it, as well as any text the author may have added to or deleted from the original AIA text. Added text is shown underlined. Deleted text is indicated with a horizontal line through the original AIA text.

Note: This Additions and Deletions Report is provided for information purposes only and is not incorporated into or constitute any part of the associated AIA document. This Additions and Deletions Report and its associated document were generated simultaneously by AIA software at 16:00:11 on 12/17/2008.

### PAGE 8

.1  up to  Two____(  2  ) reviews of each Shop Drawing, Product Data item, sample and similar submittal of the Contractor.

.2  up to  Two___(  2  ) visits to the site by the Architect over the duration of the Project during construction.

.3  up to  One____(  1  ) inspections for any portion of the Work to determine whether such portion of the Work is substantially complete in accordance with the requirements of the Contract Documents.

.4  up to  One____(  1  ) inspections for any portion of the Work to determine final completion.

...

| .1 | Programming | Architect / Owner | |
|----|-------------|-------------------|---|
| .2 | Land Survey Services | Owner | |
| .3 | Geotechnical Services | Owner | |
| .4 | Space Schematics/Flow Diagrams | Not Provided | |
| .5 | Existing Facilities Surveys | Not Provided | |
| .6 | Economic Feasibility Studies | Not Provided | |
| .7 | Site Analysis and Selection | Not Provided | |
| .8 | Environmental Studies and Reports | Owner | |
| .9 | Owner-Supplied Data Coordination | Not Provided | |
| .10 | Schedule Development and Monitoring | Not Provided | |
| .11 | Civil Design | Off-Site: Owner | |
| .12 | Landscape Design | Not Provided | |
| .13 | Interior Design | Not Provided | |
| .14 | Special Bidding or Negotiation | Not Provided | |
| .15 | Value Analysis | Not Provided | |
| .16 | Detailed Cost Estimating | Not Provided | |
| .17 | On-Site Project Representation | Not Provided | |
| .18 | Construction Management | Not Provided | |
| .19 | Start-up Assistance | Not Provided | |
| .20 | Record Drawings | Not Provided | |
| .21 | Post-Contract Evaluation | Not Provided | |
| .22 | Tenant-Related Services | Not Provided | |
| .23 | Structural Engineering | Architect | |
| .24 | MEP Engineering | Architect | |
| .25 | Civil Engineering (On-Site) | Architect | |

### PAGE 9

Dr. Daniel P. King, Superintendent of Schools        Eli R. Ochoa, P.E., AIA



Additions and Deletions Report for AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:00:11 on 12/17/2008 under Order No.1000870781_1 which expires on 9/10/2009, and is not for resale.
User Notes:                                                                 (3034584360)

1

C-5149-14-H

## *Certification of Document's Authenticity*
*AIA® Document D401™ – 2003*

I, Eli R. Ochoa, P.E., AIA, hereby certify, to the best of my knowledge, information and belief, that I created the attached final document simultaneously with its associated Additions and Deletions Report and this certification at 16:00:11 on 12/17/2008 under Order No. 1000370781_1 from AIA Contract Documents software and that in preparing the attached final document I made no changes to the original text of AIA® Document B141™ – 1997 Part 2 - Standard Form of Architect's Services: Design and Contract Administration, as published by the AIA in its software, other than those additions and deletions shown in the associated Additions and Deletions Report.

_____
*(Signed)*

_____
*(Title)*

_____
*(Dated)*

AIA Document D401™ – 2003. Copyright © 1992 and 2003 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:00:11 on 12/17/2008 under Order No.1000370781_1 which expires on 9/10/2009, and is not for resale.
User Notes:                                                                                                                              (3034684380)

1

C-5149-14-H



**PSJA ISD SCHOOL ASSESSMENTS FOR MEMORIAL MIDDLE SCHOOL**
**ERO Project #07058**

**PHARR-SAN JUAN-ALAMO Independent School District**
Contact: Dr. Manual Rivera, Deputy Superintendent
956-702-5600 or mrivera@psja.k12.tx.us
Mercedes Rivera, Secretary 956-702-5600 ext. 1020

## Executive Summary of Existing Building & Site Inspections for Memorial Middle School Assessment

We have concluded our assessment of the existing buildings and site conditions at this former middle school campus.  We have established probable costs of construction to remediate and renovate existing conditions and to construct a new 55,000 square foot addition.  The addition has yet to be programmed, but is necessary to develop a middle school that will achieve functional equity with a typical 1000 to 1200 student middle school campus.  Based on this premise, we conclude that the probable cost of construction to remediate and renovate the existing buildings and provide for the required new construction is $26,900,000.  Because current 1000 to 1200 student middle school campuses cost approximately $20,000,000 to construct, we recommend that the District consider replacing this campus in lieu of renovation.  Key factors to consider when contemplating renovations and additions to this campus are as follows:

> The current Memorial Middle School Campus is approximately 9.5 acres.  The TEA recommended acreage size for a middle school campus of 1000 students is approximately 30 acres.

> Existing room sizes do not meet TEA recommendations.  Renovations to existing buildings could include combing classrooms to meet current TEA recommendations, but would lower the overall number of existing classrooms.

> During the construction period of approximately 12 months, all current uses must be accommodated in other locations.

> Efforts to renovate the existing facilities would exceed the cost of a new facility of comparable "Equal Facilitation."

> A campus of 1000 students requires approximately 140,000 square feet of building.  This is 55,000 more than currently exist at the Memorial Middle School campus. Site constraints limit the location for new construction, parking and other improvements.

> Moisture problems are present both inside the buildings and with surface drainage on site.   Six inches of standing water, as seen on a site visit, if not corrected soon will cause further structural damage to the facilities. Water leakage from roofs, old windows and doors, as well as HVAC equipment also

C-5149-14-H

add to the ongoing decay of the facilities.

➢ Costs to remediate the structural components of the buildings are extensive. Uneven settlement of the foundation has occurred, requiring underpinning. Often times in selective demolition to structure for repairs, unknown circumstances become apparent that lead to additional demolition than what was planned.

➢ Health issues are of concern due to the rodent and pigeon infestation in the main building. Professional clean-up of the facilities is needed prior to any renovation work beginning.

➢ The State of Texas Historical Commission has guidelines and procedures that will need to be followed during any renovation or addition to the main building, a State of Texas registered historic building. Careful coordination with the State agency is a must.

Below is a summary of the site inspections performed by various consultants. This summary is intended as a broad overview of the reports submitted by the consultants; refer to each individual consultant's report for details, recommendations and further information.

**General Conditions**
The existing Memorial Middle School site is approximately 9.5 acres located at 714 E. Highway U. S. 83 in Pharr, Texas. The subject property consists of the Main building, a Cafeteria building, a Classroom Annex I building, a Classroom Annex I building, a Gymnasium, a Dressing Room building, Field Locker Room building, Stambaugh building, Textbook Department building and landscaped areas and parking lots. The school was originally constructed in 1915 and subsequently remodeled with additions added in 1976 and 1986. The school contains approximately 85,202 square feet of floor area.

ERO International and our consultants have conducted site visits and researched building, site and code issues. The City of Pharr Building Code (2003 IBC) and Texas Accessibility Standards will apply to future renovations or additions to the campus.

**Renovation & Possible Addition**
Key repairs needed in the near term include reroofing, asphalt paving, re-pointing and caulking of exterior walls, replacement of windows and doors, environmental remediation, accessibility improvements, life safety improvements and fire suppression system, as well as electrical, plumbing and mechanical upgrades. Infestation of rodents, pigeons and feces were reported in the main building. Proper safety measures should be taken to remove, clean up and inhibit future infestation.

If existing buildings are to be renovated for middle school use, the buildings would need major transformations. The main building would likely require evisceration of interior components so structural repairs could be made to the foundation, subflooring and walls. Demolition of the Field Locker Room building is recommended, as the structure is compromised and repair costs are greater than replacement costs.

C-5149-14-H

Recommended site improvements include replacement of deteriorated asphalt paving, additional parking spaces, site lighting and sidewalk improvements. Standing water under the buildings was reported during one site visit and other drainage concerns were noted. The moisture problems have led to serious damage of structural components in the main building.

New construction at the site should accommodate approximately 55,000 square feet of building to house classrooms, restrooms, administration, nurse's station, teacher's lounge, as well as mechanical and ancillary spaces.

Sub-Surface Geotechnical
Raba Kistner Consultants, Inc. is providing a subsurface exploration and Geotechnical Evaluation at the site. The soils information will aid the structural engineer in evaluating the foundation stabilization recommendation, as well as determine the foundation requirements for new construction on the campus. This information will be provided as soon as it is available.

Foundation & Structure
With the exception of the Stambaugh Building and the old Band Hall Building, the structural systems seem to be functioning adequately. The Stambaugh and Band Hall buildings will require some underpinning of the perimeter foundation beams and some additional patchwork to the foundation skirt curbing.

Civil Engineering
Halff Associates, Inc., has performed a field investigation to observe the drainage conditions and will produce a topographic survey. This information will be provided as soon as it is available.

Termites
Terminix conducted a visible and accessible walk-through inspection of both the interior and exterior of the facilities and observed termite activity in subterranean areas with existing damage to the building. Terminix is recommending a liquid Termidor treatment as well as a combination of trenching, irrigating and drilling & rodding techniques. The price for treatment is $21,162.00, with an annual maintenance fee of $3,396.00. Also noted is infested of pigeons, rodents and feces that will require trained personnel with proper safety equipment for cleanup.

Asbestos
During our site visits, we noticed that potential asbestos-containing materials were found in the building and are typical of buildings of this age. These potential asbestos-containing materials include joint compound, flooring, floor mastics, wall texture, ceiling tiles, and possibly other items not accessible for easy viewing during our site visit. Due to this potential, it is recommended that a full asbestos survey of the existing buildings be completed at the time PSJA ISD moves forward with plans to renovate existing buildings on campus, as part the Architectural and Engineering design team. A licensed professional shall conduct an asbestos survey and collect samples of wall texture, joint compound, ceiling texture, sheet flooring and floor mastics or other materials suspected to test positive for asbestos content. The work should include identification of asbestos-containing material square footages and a proposal for preparation of abatement specifications, contractor pre-bid meeting,

C-5149-14-H

abatement contractor selection, consultation with Texas Department of State Health Services, baseline air samples, air monitoring services, and generation of the final air monitoring reports. For more detailed information, see "Asbestos Procedures" at the end of Tab 2.

## Lead Paint

During renovation efforts, portions of the interior and exterior painted surfaces may require "significant abrasion" prior to modifying the building for reuse. Due to the age of the building and the known past renovations/additions, it is recommended that a full Lead Paint survey be conducted at the time PSJA ISD moves forward with plans to renovate existing buildings on campus, as part the Architectural and Engineering design team. Samples should be taken and tested based on the HUD standards for LBP, which is 0.5% by weight, or equivalent to 5,000 ppm.

## Mold Assessment

A visual assessment for mold was done of the walls, ceilings, floors and windows that were readily accessible during our site visits. Continuous moisture problems were seen and reported by staff. Elevated mold concentrations in indoor environments occur when both moisture and food source are present. Indoor food sources for mold growth can include organic materials such as those resulting from flood or sewer back-up, or building materials high on cellulose such as carpet backing, drywall paper or ceiling panels. Moisture sources in buildings can occur as a result of leaks from water or sewer lines, moisture intrusion through roofs, windows, walls and foundations or as condensation in HVAC systems. Standing water under portables and multiple moisture problems caused by courtyard flooding, moisture on the floor of the counselor's office and A/C condensate line leaks cause concern for the potential for mold growth. We recommended that a full Mold Assessment survey be conducted at the time PSJA ISD moves forward with plans to renovate existing buildings on campus, as part the Architectural and Engineering design team. Removal of associated building materials that are above the regulated quantities need to be accomplished by a trained and licensed mold contractor. Areas of concern within the facility that fall below the regulated quantities by the State and may be removed by a general contractor or maintenance personnel. However, we recommend that remediation be accomplished under the control of a trained and licensed mold contractor.

## Key Repair Costs

Key repair costs should be allocated to cover the costs of reroofing, asphalt paving, re-pointing and caulking of exterior walls, replacement of windows and doors, environmental remediation, accessibility improvements, life safety improvements and fire suppression system, as well as electrical, plumbing and mechanical upgrades. Additional items are in need of repair and have been identified. A full breakdown of probable costs is provided in section eight (8) of this document. The future use of the main building may also impact the cost needed for repairs. A probable cost of $26,908,834 is anticipated. However, further investigation may uncover unknown items to be addressed.

C-5149-14-H

**Memorial Middle School - Additions & Renovations**

**Probable Cost Estimate**

Date: March 3, 2008

| Div. No. | Section | Description of Work | Quantity | Cost Unit | Material | Labor | Total M&L | Total Cost |
|---|---|---|---|---|---|---|---|---|
| **01** | **General Requirements** | | | | | | | |
| 01 1000 | Summary of Work | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 0200 | Price and Payment Procedures | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 2100 | Allowances | A/E Allowances 3% of total cost of construction | 1 | Job | $0.00 | $775,284 | $775,284.00 | $775,284 |
| 01 2200 | Unit Prices | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 2300 | Alternates | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 3000 | Administrative Requirements | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 3216 | Construction Progress Schedule | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 3545 | Sustainable Design Project Requirements | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 4219 | Reference Standards | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 5000 | Temporary Facilities and Controls | Temporary Utilities | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 5100 | Temporary Utilities | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 5213 | Field Offices and Sheds | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 5713 | Temporary Erosion and Sedimentation Control | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 5813 | Temporary Project Signage | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 6000 | Product Requirements | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 7419 | Construction Waste Management and Disposal | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 7800 | Closeout Submittals | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| **02** | **Site Construction** | | | | | | | |
| 02 4100 | Demolition | Site & Building Demolition | 85,202 | SF | $0.00 | $5.00 | $5.00 | $426,010 |
| 02 4100 | Demolition | Gutting Building Interior | 85,202 | SF | $0.00 | $3.54 | $3.54 | $301,615 |
| 027410 | Bituminous Paving | Asphaltic Pavement | 0 | SY | $2.63 | $0.62 | $3.25 | $0 |
| 027660 | Pavement Markings | Lines on Pavement | 20,000 | LF | $0.11 | $0.08 | $0.19 | $3,800 |
| 027700 | Curbs & Gutters | Steel Forms, 6"x18" | 0 | LF | $5.00 | $2.00 | $7.00 | $0 |
| 027750 | Sidewalks | Sidewalks & Driveways | 4,500 | SF | $1.08 | $1.07 | $2.15 | $9,675 |
| 028100 | Underground Irrigation System | Rework existing irrigation system | 2,500 | LF | $5.00 | $5.00 | $10.00 | $25,000 |
| 029230 | Sodding | Ground Cover | 2,500 | CY | $0.33 | $1.00 | $1.33 | $3,325 |
| 029301 | Termite Treatment | Liquid Termidor Treatment | 1 | LS | $0.00 | $21,162 | $21,162.00 | $21,162 |
| | **Terracon's Estimated Repair Costs** | | | | | | | |
| | Roof | Core samples & reports | 1 | LS | $0.00 | $20,000 | $20,000.00 | $20,000 |
| | Structural | Structural review and report | 1 | LS | $0.00 | $40,000 | $40,000.00 | $40,000 |
| | Lighting | Site Lighting Review | 1 | LS | $0.00 | $12,000 | $12,000.00 | $12,000 |
| | Site | Environmental review and report | 1 | LS | $0.00 | $40,000 | $40,000.00 | $40,000 |
| | Asphalt Paving | Complete Resurface | 78,000 | SF | $0.00 | $8 | $7.50 | $585,000 |

C-5149-14-H

## Memorial Middle School - Additions & Renovations
## Probable Cost Estimate
### Date: March 3, 2008

| Div. No. | Section | Description of Work | Quantity | Cost Unit | Material | Labor | Total M&L | Total Cost |
|---|---|---|---|---|---|---|---|---|
| | Signage | ADA Parking Signage | 2 | EA | $0.00 | $200 | $200.00 | $400 |
| | Sidewalks | Repairs | 1 | LS | $0.00 | $6,000 | $6,000.00 | $6,000 |
| | Site Lighting | Additional Lighting | 1 | ALW | $0.00 | $60,000 | $60,000.00 | $60,000 |
| | Main Building Auditorium | Walkway Repairs | 1 | LS | $0.00 | $25,000 | $25,000.00 | $25,000 |
| | Exterior Masonry Walls | Caulking and Repointing | 30,000 | SF | $0.00 | $5 | $5.00 | $150,000 |
| | Concrete Repair | Repair spalling concrete on Cafeteria Foundation | 1 | LS | $0.00 | $2,000 | $2,000.00 | $2,000 |
| | Wall Penetrations | Seal wall penetrations | 1 | LS | $0.00 | $10,000 | $10,000.00 | $10,000 |
| | Exterior Walls | Clean Moisture Staining | 1 | LS | $0.00 | $0 | $0.00 | $0 |
| | Exterior Walls | Downspout Replacement | 1 | LS | $0.00 | $15,000 | $15,000.00 | $15,000 |
| | Windows | Window Replacement | 1 | LS | $0.00 | $750,000 | $750,000.00 | $750,000 |
| | Doors | Exterior & Interior Door & Hardware Replacement | 1 | LS | $0.00 | $250,000 | $250,000.00 | $250,000 |
| | Exterior Wood Replacement | Replacement of deteriorated wood elements on Buildings | 1 | LS | $0.00 | $15,000 | $15,000.00 | $15,000 |
| | Roof | Replacement of all roofs | 61,400 | SF | $0.00 | $8 | $7.50 | $460,500 |
| | Environmental Remediation | All Buildings | 1 | LS | $0.00 | $210,000 | $210,000.00 | $210,000 |
| | VCT Flooring Replacement | Remove & Replace Damaged flooring at Main Building, Cafeteria, Annex II, Stambaugh & Textbook Building | 1 | LS | $0.00 | $96,000 | $96,000.00 | $96,000 |
| | Terrazzo Flooring | Refinish & repair damaged flooring at Main Building | 1 | LS | $0.00 | $50,000 | $50,000.00 | $50,000 |
| | Carpet Flooring | Replacement of Carpet at Main Building | 1 | LS | $0.00 | $18,000 | $18,000.00 | $18,000 |
| | Gymnasium Flooring | Replacement of resilient flooring in Gymnasium | 1 | LS | $0.00 | $56,000 | $56,000.00 | $56,000 |
| | Ceiling | Remove & replace ceiling at Main, Cafeteria, and Textbook Building | 1 | LS | $0.00 | $65,000 | $65,000.00 | $65,000 |
| | Interior Painting | Re-paint interior walls of Main, Annex II, Stambaugh, Cafeteria, and Gymnasium | 1 | LS | $0.00 | $115,000 | $115,000.00 | $115,000 |
| | Interior Renovations | Removal & Replacement of interior walls of Main Building & Cafeteria | 1 | LS | $0.00 | $112,000 | $112,000.00 | $112,000 |
| | Interior Renovations | Remodeling of Staff and Student toilets in Main Building & Gymnasium | 1 | LS | $0.00 | $144,000 | $144,000.00 | $144,000 |
| | Elevator | Install new elevator and ADA ramps & railings in Main Building & Auditorium | 1 | LS | $0.00 | $125,000 | $125,000.00 | $125,000 |
| | Student Lockers | Install student lockers in Main Building & Gymnasium | 1 | LS | $0.00 | $190,000 | $190,000.00 | $190,000 |

C-5149-14-H

**Memorial Middle School - Additions & Renovations**

**Probable Cost Estimate**

Date: March 3, 2008

| Div. No. | Section | Description of Work | Quantity | Cost Unit | Material | Labor | Total M&L | Total Cost |
|---|---|---|---|---|---|---|---|---|
| | AHU two pipe replacement | Replace AHU two pipe in Main Building and Cafeteria with AHU four pipe | 11 | EA | $0.00 | $12,000 | $12,000.00 | $132,000 |
| | AHU two pipe replacement | Replace AHU two pipe above3 ground from central plant to Main Building and Cafeteria with AHU four pipe system | 600 | FT | $0.00 | $100 | $100.00 | $60,000 |
| | Replace pumps with separate chilled water and hot water primary and secondary | Replace central plant pumps with separate chilled water and hot water primary and secondary | 4 | EA | $0.00 | $3,000 | $3,000.00 | $12,000 |
| | Water Boiler | Replace aging central plant water boiler | 1 | EA | $0.00 | $26,000 | $26,000.00 | $26,000 |
| | Split System | Replace split system serving Library, Textbook Department, Classroom Annex I and Annex II | 70 | TON | $0.00 | $1,200 | $1,200.00 | $84,000 |
| | Ductwork Replacement | Replace ductwork serving the AHUs in Main Building | 3,000 | LBS | $0.00 | $10 | $10.00 | $30,000 |
| | DX AHUs | Replace DX AHUs in Cafeteria | 2 | EA | $0.00 | $1,200 | $1,200.00 | $2,400 |
| | RTUs & wall mounted packaged unit | Replace RTUs & wall mounted packed unit at the Stambaugh Building | 24 | TON | $0.00 | $1,200 | $1,200.00 | $28,800 |
| | Existing RTUs | Remove abandoned RTUs from Textbook Department & seal roof & openings | 1 | LS | $0.00 | $3,000 | $3,000.00 | $3,000 |
| | Outside air preconditioning units | Install new 100 percent outside air preconditioning units at the Main Building, Cafeteria, Classroom Annex I, & Annex II | 1 | LS | $0.00 | $200,000 | $200,000.00 | $200,000 |
| | Vertical Chases for outside air units | Install vertical outside air chases in Main Building to accommodate outside air conditioning units | 1 | LS | $0.00 | $10,000 | $10,000.00 | $10,000 |
| | Outside air intake hoods | Install outside air intake hoods at new RTUs of Stambaugh Building | 2 | EA | $0.00 | $1,500 | $1,500.00 | $3,000 |
| | ABS Piping | Allowance to repair ABS piping in Main Building | 1 | ALW | $0.00 | $10,000 | $10,000.00 | $10,000 |
| | Electrical | Perform infrared scan & service of switchgear, circuit breaker panels, and wiring | 1 | ALW | $0.00 | $20,000 | $20,000.00 | $20,000 |
| | Emergency Lighting | Replace emergency lighting batteries | 25 | EA | $0.00 | $100 | $100.00 | $2,500 |
| | Automatic Sprinkler system | Install automatic sprinkler systems in eight buildings | 1 | LS | $0.00 | $150,000 | $150,000.00 | $150,000 |
| | Light Fixtures | Allowance to clean & replace lamps & ballasts in lighting fixtures in Main Building & other buildings | 1 | LS | $0.00 | $10,000 | $10,000.00 | $10,000 |
| | Internet Service Equipment | Allowance to upgrade internet service equipment | 1 | LS | $0.00 | $7,000 | $7,000.00 | $7,000 |

C-5149-14-H

**Memorial Middle School - Additions & Renovations**

**Probable Cost Estimate**

Date: March 3, 2008

| Div. No. | Section | Description of Work | Quantity | Cost Unit | Material | Labor | Total M&L | Total Cost |
|---|---|---|---|---|---|---|---|---|
| | Security Devices | Allowance to install additional security devices | 1 | LS | $0.00 | $10,000 | $10,000.00 | $10,000 |
| | Replace AHU two pipe system | Replace two pipe AHU in Cafeteria with four pipe AHU | 1 | EA | $0.00 | $10,000 | $10,000.00 | $10,000 |
| | Testing & Balancing | Provide testing and air balancing at all buildings | 1 | ALW | $0.00 | $15,000 | $15,000.00 | $15,000 |
| | Plumbing | Replace selected plumbing fixtures in Main & Gymnasium prior to re-occupancy | 1 | ALW | $0.00 | $20,000 | $20,000.00 | $20,000 |
| | Domestic Water Heaters | Replace domestic water heaters in Main Building & Gymnasium prior to re-occupancy | 1 | LS | $0.00 | $10,000 | $10,000.00 | $10,000 |
| | Electrical | Provide electrical engineering study of future load demands & install additional electrical switchgear and distribution | 1 | LS | $0.00 | $75,000 | $75,000.00 | $75,000 |
| | Fire extinguishers | Replace portable fire extinguishers in Main Building & other buildings | 1 | LS | $0.00 | $5,000 | $5,000.00 | $5,000 |
| | Fire Alarm | Replace fire alarm panel, smoke detectors, pull stations, and strobe lighting | 1 | LS | $0.00 | $80,000 | $80,000.00 | $80,000 |
| | Exterior Signage | Design and Construct new Building Signage | 1 | LS | $0.00 | $8,000 | $8,000.00 | $8,000 |
| | Building Demolition | Demolition of existing Field House locker room building | 1 | LS | $0.00 | $25,000 | $25,000.00 | $25,000 |
| | | | | | $0.00 | $10 | $10.00 | $0 |
| | **Improvements and Additions** | | | | | | | |
| | Replace existing field house with new | Reconstruction of new field house and locker room | 7,000 | SF | $0.00 | $95.00 | $95.00 | $665,000 |
| | New Nurses Station | Demolition and Renovations of New Nurses Station, Toilet, office, and bed space | 1,000 | SF | $0.00 | $80.00 | $80.00 | $80,000 |
| | New Administration Office Area | Demolition and Renovations of New Administration Office, Toilet, Counselors Offices, and Conference Room. | 4,500 | SF | $0.00 | $80.00 | $80.00 | $360,000 |
| | Mechanical and Electrical Closets | Demolition and Renovations of New Mechanical and Electrical Closets. | 2,500 | SF | $0.00 | $75.00 | $75.00 | $187,500 |
| | Information Technology | Demolition and Renovations of New IT Closets. | 1,500 | SF | $0.00 | $80.00 | $80.00 | $120,000 |
| | Site Parking | Additional Parking | 16,000 | SF | $0.00 | $7.00 | $7.00 | $112,000 |

C-5149-14-H

**Memorial Middle School - Additions & Renovations**

**Probable Cost Estimate**

Date: March 3, 2008

| Div. No. | Section | Description of Work | Quantity | Cost Unit | Material | Labor | Total M&L | Total Cost |
|---|---|---|---|---|---|---|---|---|
| | New Addition Campus Addition | New Addition to increase Middle School to standard Middle school size to meet functional equity. | 55,000 | SF | $0.00 | $145.00 | $145.00 | $7,975,000 |
| | **HVAC Mechanical System** | | | | | | | |
| | Mechanical, Plumbing, and Electrical | New water source heat pumps, pump, electrical and demolition. | 85,202 | SF | $0.00 | $45.00 | $45.00 | $3,834,090 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| **Sub Total** | | | | | | | | $19,570,061 |
| | General Requirements | | | | | | 10% | $1,957,006 |
| | Overhead (5%) and Profit (10%) | | | | | | 15% | $2,935,509 |
| **Total** | | | | | | | | $24,462,576 |
| | Contingencies (10%) | | | | | | 10.00% | $2,446,258 |
| | | | | | | Total Probable Cost | | $26,908,834 |

Dog house-4
STimbaugh 9
Vocational- 1 (3)shops
Behind Lib-2
Old Band Hall

C-5149-14-H

# Memorial Middle School Main Building - Additions & Renovations

## Probable Cost Estimate

Date: March 3, 2008

| Div. No. | Section | Description of Work | Quantity | Cost Unit | Material | Labor | Total M&L | Total Cost |
|---|---|---|---|---|---|---|---|---|
| **01** | **General Requirements** | | | | | | | |
| 01 1000 | Summary of Work | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 0200 | Price and Payment Procedures | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 2100 | Allowances | A/E Allowances 3% of total cost of construction | 1 | Job | $0.00 | $188,484 | $188,484.00 | $188,484 |
| 01 2200 | Unit Prices | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 2300 | Alternates | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 3000 | Administrative Requirements | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 3216 | Construction Progress Schedule | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 3545 | Sustainable Design Project Requirements | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 4219 | Reference Standards | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 5000 | Temporary Facilities and Controls | Temporary Utilities | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 5100 | Temporary Utilities | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 5213 | Field Offices and Sheds | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 5713 | Temporary Erosion and Sedimentation Control | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 5813 | Temporary Project Signage | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 6000 | Product Requirements | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 7419 | Construction Waste Management and Disposal | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| 01 7800 | Closeout Submittals | | 0 | Job | $0.00 | $0.00 | $0.00 | $0 |
| **02** | **Site Construction** | | | | | | | |
| 02 4100 | Demolition | Site & Building Demolition | 38,000 | SF | $0.00 | $5.00 | $5.00 | $190,000 |
| 02 4100 | Demolition | Gutting Building Interior | 38,000 | SF | $0.00 | $3.54 | $3.54 | $134,520 |
| 027410 | Bituminous Paving | Asphaltic Pavement | 0 | SY | $2.63 | $0.62 | $3.25 | $0 |
| 027660 | Pavement Markings | Lines on Pavement | 6,000 | LF | $0.11 | $0.08 | $0.19 | $1,140 |
| 027700 | Curbs & Gutters | Steel Forms, 6"x18" | 0 | LF | $5.00 | $2.00 | $7.00 | $0 |
| 027750 | Sidewalks | Sidewalks & Driveways | 2,500 | SF | $1.08 | $1.07 | $2.15 | $5,375 |
| 026100 | Underground Irrigation System | Rework existing irrigation system | 1,500 | LF | $5.00 | $5.00 | $10.00 | $15,000 |
| 029230 | Sodding | Ground Cover | 1,500 | CY | $0.33 | $1.00 | $1.33 | $1,995 |
| 029301 | Termite Treatment | Liquid Termidor Treatment | 1 | LS | $0.00 | $9,460 | $9,460.00 | $9,460 |
| | **Terracon's Estimated Repair Costs** | | | | | | | |
| | Roof | Core samples & reports | 1 | LS | $0.00 | $13,600 | $13,600.00 | $13,600 |
| | Structural | Structural review and report | 1 | LS | $0.00 | $27,200 | $27,200.00 | $27,200 |
| | Lighting | Site Lighting Review | 1 | LS | $0.00 | $12,000 | $8,160.00 | $8,160 |
| | Site | Environmental review and report | 1 | LS | $0.00 | $27,200 | $27,200.00 | $27,200 |
| | Signage | ADA Parking Signage | 2 | EA | $0.00 | $200 | $200.00 | $400 |

C-5149-14-H

**Memorial Middle School Main Building - Additions & Renovations**

**Probable Cost Estimate**

Date: March 3, 2008

| Div. No. | Section | Description of Work | Quantity | Cost Unit | Material | Labor | Total M&L | Total Cost |
|---|---|---|---|---|---|---|---|---|
| | Site Lighting | Additional Lighting | 1 | ALW | $0.00 | $40,800 | $40,800.00 | $40,800 |
| | Main Building Auditorium | Walkway Repairs | 1 | LS | $0.00 | $25,000 | $25,000.00 | $25,000 |
| | Exterior Masonry Walls | Caulking and Repointing | 20,400 | SF | $0.00 | $5 | $5.00 | $102,000 |
| | Wall Penetrations | Seal wall penetrations | 1 | LS | $0.00 | $6,800 | $6,800.00 | $6,800 |
| | Exterior Walls | Clean Moisture Staining | 1 | LS | $0.00 | $0 | $0.00 | $0 |
| | Exterior Walls | Downspout Replacement | 1 | LS | $0.00 | $10,200 | $10,200.00 | $10,200 |
| | Windows | Window Replacement | 1 | LS | $0.00 | $510,000 | $510,000.00 | $510,000 |
| | Doors | Exterior & Interior Door & Hardware Replacement | 1 | LS | $0.00 | $170,000 | $170,000.00 | $170,000 |
| | Exterior Wood Replacement | Replacement of deteriorated wood elements on Buildings | 1 | LS | $0.00 | $10,200 | $10,200.00 | $10,200 |
| | Roof | Replacement of all roofs | 19,000 | SF | $0.00 | $8 | $7.50 | $142,500 |
| | Environmental Remediation | All Buildings | 1 | LS | $0.00 | $142,800 | $142,800.00 | $142,800 |
| | VCT Flooring Replacement | Remove & Replace Damaged flooring at Main Building | 1 | LS | $0.00 | $65,280 | $65,280.00 | $65,280 |
| | Terrazzo Flooring | Refinish & repair damaged flooring at Main Building | 1 | LS | $0.00 | $50,000 | $50,000.00 | $50,000 |
| | Carpet Flooring | Replacement of Carpet at Main Building | 1 | LS | $0.00 | $18,000 | $18,000.00 | $18,000 |
| | Ceiling | Remove & replace ceiling at Main Building | 1 | LS | $0.00 | $44,200 | $44,200.00 | $44,200 |
| | Interior Painting | Re-paint interior walls of Main Building | 1 | LS | $0.00 | $78,200 | $78,200.00 | $78,200 |
| | Interior Renovations | Removal & Replacement of Interior walls of Main Building | 1 | LS | $0.00 | $76,160 | $76,160.00 | $76,160 |
| | Interior Renovations | Remodeling of Staff and Student toilets in Main Building | 1 | LS | $0.00 | $97,920 | $97,920.00 | $97,920 |
| | Elevator | Install new elevator and ADA ramps & railings in Main Building | 1 | LS | $0.00 | $125,000 | $125,000.00 | $125,000 |
| | Water Boiler | Replace aging central plant water boiler | 1 | EA | $0.00 | $26,000 | $26,000.00 | $26,000 |
| | Ductwork Replacement | Replace ductwork serving the AHUs in Main Building | 3,000 | LBS | $0.00 | $10 | $10.00 | $30,000 |
| | Outside air preconditioning units | Install new 100 percent outside air preconditioning units at the Main Building | 1 | LS | $0.00 | $136,000 | $136,000.00 | $136,000 |
| | Vertical Chases for outside air units | Install vertical outside air chases in Main Building to accommodate outside air conditioning units | 1 | LS | $0.00 | $10,000 | $10,000.00 | $10,000 |
| | ABS Piping | Allowance to repair ABS piping in Main Building | 1 | ALW | $0.00 | $10,000 | $10,000.00 | $10,000 |
| | Electrical | Perform infrared scan & service of switchgear, circuit breaker panels, and wiring | 1 | ALW | $0.00 | $13,600 | $13,600.00 | $13,600 |

C-5149-14-H

## Memorial Middle School Main Building - Additions & Renovations

### Probable Cost Estimate

Date: March 3, 2008

| Div. No. | Section | Description of Work | Quantity | Cost Unit | Material | Labor | Total M&L | Total Cost |
|---|---|---|---|---|---|---|---|---|
| | Emergency Lighting | Replace emergency lighting batteries | 17 | EA | $0.00 | $100 | $100.00 | $1,700 |
| | Automatic Sprinkler system | Install automatic sprinkler systems in eight buildings | 1 | LS | $0.00 | $102,000 | $102,000.00 | $102,000 |
| | Light Fixtures | Allowance to clean & replace lamps & ballasts in lighting fixtures in Main Building | 1 | LS | $0.00 | $6,800 | $6,800.00 | $6,800 |
| | Internet Service Equipment | Allowance to upgrade internet service equipment | 1 | LS | $0.00 | $7,000 | $7,000.00 | $7,000 |
| | Security Devices | Allowance to install additional security devices | 1 | LS | $0.00 | $6,800 | $6,800.00 | $6,800 |
| | Testing & Balancing | Provide testing and air balancing | 1 | ALW | $0.00 | $10,200 | $10,200.00 | $10,200 |
| | Plumbing | Replace selected plumbing fixtures in Main Building | 1 | ALW | $0.00 | $13,600 | $13,600.00 | $13,600 |
| | Domestic Water Heaters | Replace domestic water heaters in Main Building prior to re-occupancy | 1 | LS | $0.00 | $6,800 | $6,800.00 | $6,800 |
| | Electrical | Provide electrical engineering study of future load demands & install additional electrical switchgear and distribution equipment | 1 | LS | $0.00 | $51,000 | $51,000.00 | $51,000 |
| | Fire extinguishers | Replace portable fire extinguishers in Main Building | 1 | LS | $0.00 | $3,400 | $3,400.00 | $3,400 |
| | Fire Alarm | Replace fire alarm panel, smoke detectors, pull stations, and strobe lighting | 1 | LS | $0.00 | $52,000 | $52,000.00 | $52,000 |
| | Exterior Signage | Design and Construct new Building Signage | 1 | LS | $0.00 | $8,000 | $8,000.00 | $8,000 |
| | | | | | | | | |
| | **Improvements and Additions** | | | | | | | |
| | Mechanical and Electrical Closets | Demolition and Renovations of New Mechanical and Electrical Closets. | 1,000 | SF | $0.00 | $75.00 | $75.00 | $75,000 |
| | Information Technology | Demolition and Renovations of New IT Closets. | 1,000 | SF | $0.00 | $80.00 | $80.00 | $80,000 |
| | Site Parking | Additional Parking | 6,000 | SF | $0.00 | $7.00 | $7.00 | $42,000 |
| | | | | | | | | |
| | **HVAC Mechanical Systems** | | | | | | | |
| | Mechanical, Plumbing, and Electrical | New water source heat pumps, pump, electrical and demolition. | 38,000 | SF | $0.00 | $45.00 | $45.00 | $1,710,000 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| **Sub Total** | | | | | | | | $4,739,494 |
| | General Requirements | | | | | | 10% | $473,949 |
| | Overhead (5%) and Profit (10%) | | | | | | 15% | $710,924 |
| **Total** | | | | | | | | $5,924,366 |
| | Contingencies (10%) | | | | | | 10.00% | $592,437 |

C-5149-14-H

**Memorial Middle School Main Building - Additions & Renovations**

**Probable Cost Estimate**

Date: March 3, 2008

| Div. No. | Section | Description of Work | Quantity | Cost Unit | Material | Labor | Total M&L | Total Cost |
|---|---|---|---|---|---|---|---|---|
| | | | | | Total Probable Cost | | | $6,516,804 |

C-5149-14-H



Rimkus Consulting Group, Inc.
100 Savannah, Suite 470
McAllen, Texas 78503
(956) 683-1783 Telephone
(956) 683-0157 Facsimile
Certificate of Authorization No. F-1545

*THE ORIGINAL OF THIS REPORT, SIGNED AND SEALED BY THE PROFESSIONAL WHOSE NAME
APPEARS ON THIS PAGE, IS RETAINED IN THE FILES OF RIMKUS CONSULTING GROUP, INC.*

# Report of Findings

## STRUCTURAL COLLAPSE EVALUATION
Insured:  Pharr-San Juan-Alamo ISD
Claim No:  040510119089

### RCG File No:  154526

Prepared For:

**CHUBB INSURANCE COMPANY**
P.O. BOX 42065
PHOENIX, AZ  85080

Attention:

**MR. DAVID MARTINEZ**

Bruce L. Morris, P.E.
*Principal Consultant*

Steven A. Frase, P.E.
*District Manager*

January 21, 2011

C-5149-14-H

## TABLE OF CONTENTS

I.   Introduction ........................................................................... 1

II.  Conclusions .......................................................................... 2

III. Discussion ............................................................................ 3

   • General Description and History

   • Observations

   • Analysis

IV.  Basis of Report ................................................................... 9

V.   Attachments ....................................................................... 10

   A. Photographs

   B. Drawing

   C. CVs

RECEIVED

2011 FEB 18 PM 2:39

PSJA-PURCHASING DEPT.

January 21, 2011

C-5149-14-H

## Section I
## INTRODUCTION

Representatives of the Pharr-San Juan-Alamo Independent School District (PSJA ISD) have reported that a portion of a school building collapsed during renovation work being performed by a contractor (Texas Descon) on September 22, 2010. The school building is located at 714 East Business Highway 83 in Pharr, Texas.

Rimkus Consulting Group (Rimkus) was retained by Chubb Insurance Company to determine the limits of intended work to be performed by the contractor and to determine the extent of damage to the building outside of those limits as a result of work being performed by the contractor. Mr. Bruce L. Morris, P.E., performed an on-site inspection of the building on January 18, 2011. Mr. Reynaldo Sanchez, construction manager for PSJA ISD, and Mr. Steve Lemmons, of Universal Claims Services, Inc., were present during portions of our inspection. Mr. Morris also visited with Mr. Rene Campos, an Assistant Superintendent of PSJA ISD, during his on-site inspection.

This report was prepared for the exclusive use of Chubb Insurance Company and is not intended for any other purpose. Our report is based on the information available to us at this time, as described in **Section IV, BASIS OF REPORT.** Should additional information become available, we reserve the right to determine the impact, if any, the new information has on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted.

RECEIVED

C-5149-14-H

## Section II
## CONCLUSIONS

1. Demolition was supposed to be limited to the connecting structures between the main building and the detached classroom buildings at the east and west ends of the main building and was not intended to include any portions of the main or detached buildings themselves.

2. Collapse of the east wall of the main building above the first floor and the collapse of the second floor and roof from the east end of the main building westward to column line 1 were results of the demolition means and methods used by the demolition contractor to remove the connecting structure between the main building and east detached classroom building. This described area of collapse was outside the intended limits of demolition. Pre-existing conditions and the design and construction of the original building may have influenced the collapse.

3. Cracking in masonry columns at the north and south sides of the exit at the west end of the main building and movement of the brick veneer at the west end of the building are likely results of demolition means and methods used by the demolition contractor. Pre-existing conditions and design and construction features of the main building may have contributed. This damaged area was outside the intended limits of demolition.

4. Observed exposure of reinforcing steel in basement columns in column lines 3 and 7 is not a result of demolition work performed by the demolition contractor on the connecting structures and is not associated with the partial collapse of the main building.

C-5149-14-H

## Section III
## DISCUSSION

**General Description and History**

The main building contained a basement plus two additional floors (**Photographs 1 through 5 in Attachment A**). For purposes of discussion in this report, the front elevation, facing Business Highway 83, was referenced to face north. The structural frame of the main building was of reinforced concrete, with load-bearing clay tile block walls at the east and west ends of the building. Exterior walls are faced with brick veneer. The drawing titled "Schematic Floor Plan with Approximate Dimensions," in **Attachment B**, shows the locations of the columns and beams on the first floor which support the second floor. The locations of the columns supporting the first floor and the roof were in the same relative locations. Interior dividing walls had been removed prior to our inspection, and debris from the collapse had been removed.

The site contained three detached buildings in addition to the main building. Classroom buildings had been constructed at the east and west sides of the main building, with gaps of approximately 16 feet between the main building and the classroom buildings. A library building was located at the rear of the main building.

Mr. Rene Campos, an Assistant Superintendent with PSJA ISD, provided the following information regarding the property:

- The main building was constructed in 1915. He believes the east and west classroom buildings were constructed in 1921 or 1926. He does not know when the library building was constructed.

- Enclosed walkways or connectors between the main building and the east and west classroom buildings had been constructed at some time in the past.

C-5149-14-H

- The demolition contractor (Texas Descon) had removed the walkway structure at the west side of the main building. He does not know what equipment or techniques were used by the contractor during that work.

- He believes the contractor was using a jackhammer to separate a beam at the walkway at the east side of the main building when the east wall and portions of the second floor and roof at the east side of the main building collapsed.

According to Mr. Reynaldo Sanchez, PSJA ISD Construction Manager, the enclosed walkways at the east and west ends of the main building had been of 2-story construction. They have noticed some damage to the brick and tile block wall at the west end of the main building since the collapse at the east end of the building. Mr. Sanchez also reported that the jacks supporting the first and second floors and the roof have been installed since the collapse.

### Observations

Observations made during our on-site inspection are summarized below. Photographs referenced in the text are contained in **Attachment A.**

- Interior dividing walls had been removed in the basement, first floor, and second floor, exposing the concrete structural system of the building (**Photographs 6, 7, and 8**). Steel jacks had been installed on all levels of the main building.

- Vertical reinforcing steel was visible in basement columns in column lines 3 and 7 (**Photographs 9 and 10**).

- The second floor and roof had collapsed between the east end of the main building and column line 1, as had most of the east wall of the building above the level of the first floor (**Photographs 2 and 11**).

C-5149-14-H

- A concrete overlay had been placed on the second floor at some time in the past (**Photographs 12 and 13**).

- Pieces of masonry were attached to the undersides of the east ends of the collapsed roof and second-floor slabs (**Photographs 14, 15, and 16**).

- Inspection of the west end of the main building indicated the concrete columns at the sides of the west exit ended near the level of the first floor, with masonry columns extending above that level (**Photograph 17**). We observed cracking in the masonry columns on both sides of the exit above the first-floor level. Concrete columns had been installed at the exterior of the main building for the walkway (**Photograph 18**).

- Concrete headers, supported by load-bearing masonry, were installed above the windows at the west end of the building (**Photograph 19**).

- There was evidence of movement of the brick veneer on the first floor at the northern portion of the west wall of the main building (**Photograph 20**).

**Analysis**

Mr. Campos, of PSJA ISD, provided Rimkus with a copy of an engineering report on the building prepared by Frank Lam & Associates, Inc., Consulting Engineers (Lam), and dated October 18, 2010. Information and conclusions contained in that report are summarized below:

- The report states that they visited the site on September 22, 2010, and on October 8, 2010.

- The report states that they reviewed the Demolition Drawings and Notes prepared by ERO Architects dated February 24, 2010. The report stated that the proposed demolition involved the connecting structures between the main

C-5149-14-H

building and the detached classroom structures and included the concrete slabs of the second floor and roof, concrete columns against the main building and the detached structures, and the two levels of tie beams between the columns. The report stated that the limit of demolition stopped at the face of the exterior walls of the main building and detached structures.

- Several photographs in the report identified a Volvo BL60 backhoe with high impact chipping hammer parked near the northeast corner of the main building at the time the photographs were taken.

- They observed cracking in the masonry columns at the exit on the west side of the main building.

- The report stated that the connecting structures between the main building and the classroom structures were supported by cast-in-place concrete columns poured against the existing masonry columns at the exits at the end walls of the main building. The report states that there were no expansion joints between the existing masonry columns and the new exterior concrete columns and that these columns were plastered together, creating a bond between them.

- The report stated that there was no concrete or reinforcement inside the masonry columns at the ends of the main building.

- The report stated that an approximately 12-foot by 60-foot section of the roof and second floor of the main building had collapsed during the demolition of the structure connecting the main building with the east classroom building.

- The report states that it is their opinion that the collapse of the structure was caused by demolition means and methods and was possibly affected by pre-existing conditions and by the design and construction of the original building.

C-5149-14-H

Mr. Steve Lemmons, of Universal Claims Services, Inc., provided Rimkus with copies of photographs he took at the site prior to the removal of rubble from the collapse.

According to the Lam report, demolition work performed by the contractor was to include the connecting structures between the main building and the detached classroom buildings at the east and west end of the main building, and the limit of demolition was to stop at the faces of the main building and the detached structures. This description is consistent with information provided by Mr. Campos and Mr. Sanchez of PSJA ISD. Based on this information, we concluded that demolition was supposed to be limited to the connecting structures between the main building and the detached classroom buildings at the east and west ends of the main building and was not intended to include any portions of the main or detached buildings themselves.

Collapse of the east wall of the main building above the first floor and the collapse of the second floor and roof from the east end of the main building westward to column line 1 were results of the demolition means and methods used by the demolition contractor to remove the connecting structure between the main building and east detached classroom building. This area of collapse was outside the intended limit of demolition. Pre-existing conditions and the design and construction of the original building may have influenced the collapse. Pre-existing conditions that may have influenced the collapse include the weight of the concrete overlay observed on the second floor, bonding together of the original masonry columns and the new exterior concrete columns for the connecting structures, and cracking or spalling of the clay tile blocks prior to the collapse. Features of the design and construction of the original building that may have influenced the collapse include the use of load-bearing exterior walls to support the ends of concrete beams and slabs, the reported absence of any reinforcement in the masonry columns, and the absence of sufficient connections between the load-bearing walls and the supported concrete structural elements.

Cracking in masonry columns at the north and south sides of the exit at the west end of the main building and movement of the brick veneer at the west end of the building are

C-5149-14-H

likely results of demolition means and methods used by the demolition contractor. Pre-existing conditions and design and construction features of the main building may have contributed. We would expect the same demolition means and methods used at the east end of the main building to have been used at the west end of the structure. This damaged area was outside of the intended limit of demolition.

Observed exposure of reinforcing steel in basement columns in column lines 3 and 7 is not a result of demolition work performed by the demolition contractor on the connecting structures and is not associated with the partial collapse of the main building.

C-5149-14-H

## Section IV
## BASIS OF REPORT

1. An on-site inspection of the PSJA ISD school building was performed by Mr. Bruce L. Morris, P.E., on January 18, 2011.

2. Measurements and photographs were taken by Mr. Bruce L. Morris, P.E., on January 18, 2011.

3. Mr. Rene Campos, an Assistant Superintendent of PSJA ISD, and Mr. Reynaldo Sanchez, Construction Manager for PSJA ISD, were interviewed on January 18, 2011.

4. We reviewed photographs taken on January 18, 2011, during the inspection of the school building.

5. We reviewed an engineering report prepared by Frank Lam & Associates, Inc., Consulting Engineers, and dated October 18, 2010.

6. We reviewed photographs provided to Rimkus by Mr. Steve Lemmons of Universal Claims Services, Inc.

C-5149-14-H

## Section V
## ATTACHMENTS

A. Photographs

B. Drawing.

C. CVs

C-5149-14-H

## Section V
## ATTACHMENT A

## Photographs

Attached are photographs taken during our investigation. Photographs taken during our investigation, which are not included in this report, are retained in our files and are available to you upon request.

January 21, 2011
RCG File No. 154526

C-5149-14-H

**Photograph 1**
Front (north) elevation of main building, looking south.



**Photograph 2**
East elevation of main building, looking south.



January 21, 2011
RCG File No. 154526

C-5149-14-H

**Photograph 3**
West elevation of main building with partial north elevation of west classroom building and gap between buildings, looking south.



**Photograph 4**
Rear (south) elevation of main building with northeast corner of library, looking west.



January 21, 2011
RCG File No. 154526

C-5149-14-H

**Photograph 5**
North elevation of east classroom building, looking southeast.



**Photograph 6**
Northwest portion of basement with exposed columns and beams, with supporting jacks.



January 21, 2011
RCG File No. 154528

C-5149-14-H

**Photograph 7**
First floor with exposed concrete columns and beams, looking east.



**Photograph 8**
Second floor with exposed concrete columns and beams, with supporting jacks, looking east.



January 21, 2011
RCG File No. 154526

C-5149-14-H

Photograph 9
Exposed reinforcing steel at a basement column in column line 7.



Photograph 10
Exposed reinforcing steel at a basement column in column line 3.



January 21, 2011
RCG File No. 154628

C-5149-14-H

**Photograph 11**
Collapsed roof and second floor at east end of main building, looking north.



**Photograph 12**
Concrete overlay at north portion of the second floor at the east end of the main building.



January 21, 2011
RCG File No. 154526

C-5149-14-H

**Photograph 13**
Concrete overlay at south portion of the second floor at the east end of the main building.



**Photograph 14**
Pieces of masonry attached to east end of collapsed roof slab.



January 21, 2011
RCG File No. 154528

C-5149-14-H

**Photograph 15**
Pieces of masonry attached to underside of east end of collapsed roof slab.



**Photograph 16**
Pieces of masonry attached to underside of east end of collapsed second floor slab.



January 21, 2011
RCG File No. 154526

C-5149-14-H

**Photograph 17**
Concrete column from basement ends at first-floor level at entrance on west side of building, with masonry column above first-floor level, with exterior column for walkway.



C-5149-14-H

**Photograph 18**
View of exterior columns for walkway at west end of main building, looking south.

